**STATE of Minnesota, Respondent,**

v.

**Michael MEDAL–MENDOZA, Appellant.**

**No. A05–1084.**

Supreme Court of Minnesota.

Aug. 3, 2006.

Melissa Sheridan, Eagan, MN, for appellant.

Michael Hatch, Attorney General, Susan Gaertner, Ramsey County Attorney, Mark Nathan Lystig, Asst. Ramsey County Attorney, St. Paul, MN, for respondent.

## OPINION

MEYER, Justice.

On January 12, 2004, a shooting incident occurred in Saint Paul, during which Ronald Edward Glasgow and Wayne Louis Costilla were shot to death. A third victim, Andria Rai Crosby, was severely injured. In December 2004, a Ramsey County jury found appellant Michael Medal–Mendoza guilty of six felony counts related to the shootings. Medal–Mendoza was then convicted and sentenced to two consecutive terms of life in prison for two first-degree murder convictions and to a consecutive term of 180 months in prison for an attempted first-degree murder conviction.

On direct appeal to this court, Medal–Mendoza argues that the district court committed prejudicial error during his trial because (1) the court violated Medal–Mendoza's right to present a defense by not allowing him to present evidence of his codefendants' gang affiliation with each other and with a third person; (2) the court improperly allowed a police officer to testify as an expert regarding "triangula-

tion" evidence; and (3) the court instructed the jury that it could consider Medal–Mendoza's flight as proof of his guilty intent. In his pro se supplemental brief, Medal–Mendoza additionally claims that he was deprived of his right to confront his accusers because the state introduced evidence that was provided by a confidential informant. He also claims ineffective assistance of trial counsel. We affirm the district court.

Some time after 4:00 a.m. on January 12, 2004, the Saint Paul Police Department Communications Center received a 911 call from a woman at a St. Paul address who reported that she had been shot and needed medical help. Several officers responded to the call, entered the basement apartment and found Andria Rai Crosby lying on the kitchen floor with gunshot wounds to her leg and chest. Crosby informed the officers that "three dudes, two Mexicans and a mulatto" had shot her. The police officers found Ronald Edward Glasgow and Wayne Louis Costilla in the living room of the apartment. Glasgow was shot in the head and chest and appeared to be dead. Costilla, who received gunshot wounds in his head and neck, was breathing but unconscious. Later, Costilla died at the hospital.

Crosby testified at Medal–Mendoza's trial. According to Crosby, on the evening of January 11, 2004, she was at a hotel room with her boyfriend, Glasgow, and her friend, Costilla. The three of them played video games and dominos. Crosby testified that they all used methamphetamine that evening, and that she also smoked some marijuana. At some point, Costilla received a telephone call from a person seeking to buy some methamphetamine. Crosby and Glasgow decided that they would sell one ounce of methamphetamine to Costilla for $1,500 to $1,600, and Costilla

in turn told the caller that he had methamphetamine for sale.

Crosby, Glasgow, and Costilla went to Costilla's apartment on Burns Avenue to wait for the caller, who was coming from a Perkins restaurant with some friends. At about 1:30 a.m. on January 12, 2004, the caller, who Crosby later learned was James Green, arrived at Costilla's apartment. Crosby testified that she recognized Green as someone that she had known from high school. Green was friendly, and after about 15 or 20 minutes Costilla invited the two men that Green was with into the apartment. Crosby described the taller man as a "whitish Mexican," who had "pitch black eyes" that were "stone cold," and the shorter man as a "blackish Mexican," who was "well dressed" and "more preppy." Crosby testified that the three men stayed for about 15 minutes and discussed the transaction, during which period the shorter Mexican, whom Crosby identified in court as Michael Medal–Mendoza, made a telephone call to someone named "Lucky." Costilla then gave Medal–Mendoza a sample bag of methamphetamine, and the three men left the apartment to meet some buyers at a gas station down the street.

Crosby testified that the three men came back to Costilla's apartment after about 30 minutes. They kicked the apartment door open, and Medal–Mendoza came in first with a big, shiny, silver gun. Green and the other "whitish Mexican" came in together after Medal–Mendoza, also carrying guns. Medal–Mendoza pointed his gun at Glasgow, and the following exchange ensued:

Medal–Mendoza: I am robbing you, mother f* * * * *.

Glasgow: You ain't robbing me, mother f* * * * *.

Medal–Mendoza: I will shoot you.

Glasgow: You are going to have to shoot me then because you sure as hell ain't robbing me.

Medal–Mendoza then shot Glasgow in the head. Crosby started to scream, was shot, and dropped to the ground. After firing several gunshots, the three men ran out of the apartment. Crosby stayed on the floor, feeling a burning sensation in her chest and extreme warmth in her legs.

Crosby testified that one of the men returned to the apartment, kicked and nudged Crosby, grabbed her purse, and then left. Once Crosby was sure the three men had gone, she got up, started screaming, and called 911.

In the police investigation, Crosby identified Green from her high school yearbooks as the man who had come to Costilla's apartment to buy drugs. Crosby also identified Green from a six-person photographic lineup that the police had prepared. She subsequently identified Daniel Valtierra from a six-person photographic lineup as the taller Mexican who had participated in the robbery. Later, the police learned from an informant that the three people who had committed the crime were "J.G." (Green), "Danny V." (Valtierra), and "Brooklyn" (Medal–Mendoza).

The informant directed the police to a Maplewood apartment where the suspects were staying. The police obtained a search warrant and searched the Maplewood apartment in the afternoon of January 12, 2004. None of the suspects were at the apartment, but the police officers were able to talk to Alison Kinsel, who was Green's girlfriend, and Medal–Mendoza's younger brother, who is known as "Lucky." The officers then learned that Medal–Mendoza is known as "Brooklyn."

After receiving this information, the police prepared a photographic lineup that contained a picture of Medal–Mendoza. When Crosby saw the lineup, she identi-

fied Medal–Mendoza as the shooter and started crying, saying "Oh, my god. I can hear his voice. It is his eyes. I recognize his eyes." Based on Crosby's recollection that the group who came to Costilla's apartment had been at the Perkins restaurant on Robert Street, the police obtained security videotapes from the restaurant and found that one of the videotapes showed Medal–Mendoza, Green, and Valtierra at the restaurant together on the evening of the shooting.

Kinsel testified at Medal–Mendoza's trial. According to Kinsel, she woke up at about 6:00 a.m. on January 12, 2004, and Green and Valtierra were at her apartment. Later, Kinsel's friend, Joe Seals, arrived at the apartment. Kinsel had loaned her car to Seals the day before the shooting incident, but Seals told Kinsel that her car had been stolen and arrived at the apartment in a different car. Kinsel and Seals took Valtierra to the airport so that Valtierra could leave for Seattle. Valtierra could not get a flight, and the three of them returned to Kinsel's apartment. Kinsel testified that at some point Medal–Mendoza also came to the apartment. Later, Valtierra and Green left the apartment together, and Medal–Mendoza left separately. During cross-examination, Kinsel testified that to her knowledge, Medal–Mendoza was not a gang member.

In the afternoon of January 13, 2004, the police learned that Medal–Mendoza had been arrested in Wisconsin for driving while intoxicated and causing an accident. Green and Valtierra were with Medal–Mendoza at the time of the accident, but were released from police custody. Green and Valtierra returned to Saint Paul and were arrested shortly thereafter.

LeRoy DeMeules testified for the state. DeMeules testified that he met Medal–Mendoza and Green when he was incarcerated at the Ramsey County jail. According to DeMeules, Green told him that if Medal–Mendoza did not "take the charge" for the murders, Green was going to make sure Medal–Mendoza's life "wasn't too healthy up in prison." Green also wanted DeMeules to let Medal–Mendoza know that Medal–Mendoza would be rewarded if he agreed to "take the heat." DeMeules relayed this information to Medal–Mendoza, and Medal–Mendoza asked DeMeules if DeMeules would tell Medal–Mendoza's attorney what Green had said. Medal–Mendoza also told DeMeules, "Don't tell my attorney about popping the other two." Medal–Mendoza then added that he was just joking, but DeMeules thought Medal–Mendoza was being serious.

DeMeules testified that Medal–Mendoza said he and the other two men went to Costilla's apartment to "hit [rob] them for drugs and money." Medal–Mendoza also stated that the state would not be able to prove that he was at the murder scene because Rachel, a friend of his girlfriend, was going to testify that Medal–Mendoza was at her house taking a shower and in bed with her when the shootings occurred. Medal–Mendoza asked DeMeules to have his girlfriend call Rachel to confirm that Rachel would support his alibi, and DeMeules refused.

Medal–Mendoza's theory at trial was that Crosby misidentified him as the shooter and that Joe Seals, who belonged to the same gang as Valtierra and Green, was the man who committed the murders. Medal–Mendoza did not testify but called his friend, Rachel Verdaja, to testify as an alibi witness.

Verdaja testified that she knew Medal–Mendoza through his girlfriend, Antoinette Molinar. Medal–Mendoza was staying in her apartment at the time because he and Molinar were fighting. According to Verdaja, she was in her apartment sleeping in the early morning of January 12, 2004.

She woke up and heard that someone was taking a shower. She went back to sleep, and after a while Medal–Mendoza came into the bedroom and got into her bed. Verdaja testified that she did not remember the exact time that this happened, but it was sometime between 4:00 and 5:00 a.m.

On December 16, 2004, a jury found Medal–Mendoza guilty of two counts of first-degree felony murder, one count of attempted first-degree felony murder, two counts of second-degree murder, and one count of attempted second-degree murder. On March 2, 2005, the district court convicted and then sentenced Medal–Mendoza to two consecutive terms of life in prison for the first-degree murder convictions and to a consecutive term of 180 months in prison for the attempted first-degree murder conviction. This appeal followed.

I.

■ Medal–Mendoza first argues that the district court deprived him of the right to present the defense that Crosby misidentified him as the shooter and that Seals, who belonged to the same gang as Valtierra and Green, was the man who committed the murders. According to Medal–Mendoza, the district court violated his right to present a defense by not allowing him to present evidence of his codefendants' gang affiliation with each other and with Seals.

■ Evidentiary rulings generally rest within the district court's discretion. *State v. Palubicki,* 700 N.W.2d 476, 485 (Minn.2005). As such, a reviewing court will not reverse a district court's evidentiary ruling absent a clear abuse of that discretion. *Id.* A criminal defendant has the right to present a defense, which includes a right to present evidence tending to prove that another person committed the charged crime. *See State v. Hawkins,*

260 N.W.2d 150, 158 (Minn.1977). In *Palubicki,* we held that a criminal defendant may present alternative perpetrator evidence at trial in order to cast doubt on the defendant's guilt. *Palubicki,* 700 N.W.2d at 485. However, the defendant must first lay an evidentiary foundation to establish that the alternative perpetrator evidence has "an inherent tendency to connect the alternative perpetrator to the actual commission of the charged crime." *Id.* The alternative perpetrator evidence is inadmissible and a district court need not consider any of the alternative perpetrator evidence if the defendant fails to lay the proper foundation. *Id.*

Here, the record shows that Medal–Mendoza filed a pretrial motion seeking to present evidence that Green and Valtierra were both members of the Brown for Life gang. The district court did not rule on this motion, stating it would have to "see that in context" before deciding whether to admit the evidence. During cross-examination of Kinsel, Medal–Mendoza's counsel attempted to question Kinsel about whether Green, Valtierra, and Seals belonged to the same gang. The state objected, arguing that the gang affiliation evidence was irrelevant. Medal–Mendoza's counsel responded that the fact that Seals belonged to the same gang as Green and Valtierra and the fact that Seals was with Green and Valtierra before the shootings occurred indicates that Medal–Mendoza was misidentified by Crosby as the shooter.

The district court sustained the state's objection, concluding that "at some point, the gang membership may become relevant. Right now it isn't." The court further explained:

[Counsel] thinks there is [relevance to the gang affiliation evidence.] She thinks there are gang experts who would come in here and testify that gang members don't commit crimes with non-

gang members. That is what she thinks. I haven't heard it yet. It hasn't been disclosed, etcetera. We will deal with that if she ever—if she gets to a point. What I am ruling now, it is not relevant because I don't have any foundation for what you are talking about.

The trial then proceeded, and Medal–Mendoza did not introduce any further evidence on the subject.

We conclude that the district court correctly precluded Medal–Mendoza from introducing Green, Valtierra, and Seals' gang affiliation evidence because this evidence did not have the inherent tendency to connect the alleged alternative perpetrator, Seals, to the commission of the murders. *See Palubicki*, 700 N.W.2d at 485. Specifically, the fact that Seals belonged to the same gang as Green and Valtierra and borrowed a car from Kinsel the day before the shooting does not, by itself, inherently connect Seals to the murders. At trial, Medal–Mendoza produced no evidence that gang members do not commit crimes with non-gang members or that Seals fit Crosby's description of the shooter. As such, Medal–Mendoza failed to produce evidence that had an inherent tendency to connect Seals to the actual commission of the crimes. We therefore conclude that the district court did not err when it refused to admit the gang affiliation evidence.

## II.

■ Medal–Mendoza next argues that the district court committed prejudicial error when it allowed Sergeant Dunnom of the Saint Paul Police Department to testify as an expert about the violent character of the "drug community" and the phenomenon of "triangulation." Specifically, at Medal–Mendoza's trial Dunnom testified over Medal–Mendoza's relevancy objection that "triangulation" occurs when a drug buyer brings additional people, who "split and go into a formation where they have now—you can't watch all of them, the exits or entrances are now covered and you have someone to your left, to the right and in front of you." Dunnom further testified that triangulation "is a danger signal because that can mean either robbery, at best, or a murder, at worst."

■ Evidentiary rulings " 'rest within the sound discretion of the [district] court, and we will not reverse such evidentiary rulings absent a clear abuse of discretion.' " *State v. Morton*, 701 N.W.2d 225, 234 (Minn.2005) (quoting *State v. Sanchez-Diaz*, 683 N.W.2d 824, 835 (Minn.2004)). We have previously stated that expert testimony is only admissible if the testimony will help the trier of fact in evaluating evidence or resolving factual issues. *State v. DeShay*, 669 N.W.2d 878, 884 (Minn. 2003). When a district court errs in admitting expert testimony, a reviewing court will grant a new trial only when the error substantially influences the jury's decision. *State v. Valtierra*, 718 N.W.2d 425, 435 (Minn.2006).

In *Valtierra*, we considered the same "triangulation" argument made by Medal–Mendoza's codefendant, Valtierra, in Valtierra's direct appeal. *Id.* at 434. We concluded that because "triangulation" as described by Dunnom did not in fact occur, Dunnom's "triangulation" testimony in Valtierra's trial, which was substantially similar to her testimony at Medal–Mendoza's trial, did not help the jury in evaluating evidence or resolving factual issues. *Id.* at 435. Accordingly, we held that the district court abused its discretion by permitting Dunnom to testify about triangulation. However, we concluded that the error was harmless because Valtierra's convictions hinged on Crosby's testimony that Valtierra had wielded a gun at Costilla's apartment, and the triangulation

testimony was unlikely to have substantially influenced the jury's decision. *Id.*

Similar to *Valtierra,* the jury's verdict in the instant case was also based on Crosby's identification of Medal–Mendoza as the shooter. Accordingly, Dunnom's "triangulation" testimony at Medal–Mendoza's trial did not substantially influence the jury's decision. We therefore conclude that the district court's error in admitting Dunnom's "triangulation" testimony was harmless and does not warrant a new trial.

### III.

Medal–Mendoza next argues that the district court committed reversible error when it instructed the jury that it could consider Medal–Mendoza's flight as proof of Medal–Mendoza's guilty intent. Specifically, Sergeant Jane Laurence of the Saint Paul Police Department testified at the trial that the police learned from "reliable informants" that Medal–Mendoza, Valtierra, and Green left Saint Paul after the shooting and drove to Chicago. The informants also told the police that Medal–Mendoza, Valtierra, and Green then "turned around" and were returning to Saint Paul. The police subsequently learned that the defendants were involved in an accident while driving back to Saint Paul and Medal–Mendoza was arrested in Wisconsin. Based on this information, the court gave the following flight jury instruction over Medal–Mendoza's objection:

> It is for you alone to decide whether or not the defendant fled after the alleged crimes. If you determine that he did flee, then you may take such flight into consideration as an inference of guilty intention at the time of the incident, giving rise to these charges.
>
> Flight in itself is not conclusive evidence of a guilty intent; but if you find such flight existed, then you may consider it, along with all of the other perti-

nent evidence in this case in determining whether or not the State has established that the defendant possessed the requisite intent at the time and place of the alleged crimes.

Generally, a district court has considerable latitude in choosing jury instructions. *State v. Baird,* 654 N.W.2d 105, 113 (Minn.2002). A reviewing court will not reverse a trial court's decision on jury instructions unless the trial court abused its discretion. *State v. Persitz,* 518 N.W.2d 843, 848 (Minn.1994). Our court has previously permitted a flight jury instruction. *See State v. McLaughlin,* 250 Minn. 309, 319, 84 N.W.2d 664, 671–72 (1957). But, in more recent cases we have instructed the district courts to avoid "jury instructions advising that a particular fact may be inferred from other particular facts, if proved." *State v. Litzau,* 650 N.W.2d 177, 185–86 (Minn.2002) (holding reversal warranted where a permissive inference instruction on possession of a controlled substance contributed to the cumulative prejudicial effect of the errors in defendant's trial); *see also State v. Olson,* 482 N.W.2d 212, 215–16 (Minn.1992) (holding it was reversible error to give the jury a permissive inference instruction on possession of a controlled substance).

We note that the district court gave the same flight jury instruction in Valtierra's trial, and Valtierra argued on appeal that the court erred in so instructing. In Valtierra's appeal, we concluded that giving the flight jury instruction was error because (1) it improperly focuses the jury on a particular fact; i.e., the fact of defendant's flight, which gives the impression to the jury that the court believes that the subject of the instruction has elevated significance; (2) the relationship between a defendant's flight and his guilty intent is a matter that should normally be left to the jury's judgment; (3) it injects argument

into and unnecessarily lengthens the judge's charge; and (4) allows juries to avoid assessing the myriad facts that make specific cases unique. *Valtierra*, 718 N.W.2d at 432–33. Because our rationale for rejecting the flight jury instruction in *Valtierra* also applies to Medal–Mendoza's trial, we conclude that the court erred in instructing the jury that it could consider Medal–Mendoza's flight as proof of his guilty intent.

■ Erroneous jury instructions merit a new trial "if it cannot be said beyond a reasonable doubt that the error had no significant impact on the verdict." *Olson*, 482 N.W.2d at 216. Here, the erroneous flight jury instruction did not have a significant impact on the jury's verdict. First, the record indicates that the state's case against Medal–Mendoza was very strong. As discussed above, the critical evidence in this case is Crosby's testimony and her identification of Medal–Mendoza as the shooter, and not Medal–Mendoza's flight after the crime. In addition, police officers testified that Medal–Mendoza was arrested while driving back to Saint Paul, and this testimony mitigated the harm that may have resulted from the impermissible flight instruction. We therefore conclude that the district court's flight jury instruction at issue does not warrant a new trial.

## IV.

■ In his pro se supplemental brief, Medal–Mendoza additionally claims that he was deprived of his right to confront his accusers because the state introduced evidence that was provided by a confidential informant. According to Medal–Mendoza, Sergeant Jane Laurence should not have been allowed to testify that an unidentified informant told the police that the three people who committed the murders were: J.G., Danny V. and Brooklyn.

■ Initially, we note that Medal–Mendoza failed to object to this evidence at trial and, therefore, we review the admission of the evidence under the plain error doctrine. Minn. R.Crim. P. 31.02; *State v. Griller*, 583 N.W.2d 736, 740 (Minn.1998). Accordingly, Medal–Mendoza must show that the district court's failure to sua sponte exclude the testimony at issue constituted (1) an error; (2) that was plain; and (3) that affected Medal–Mendoza's substantial rights. *State v. Strommen*, 648 N.W.2d 681, 686 (Minn.2002).

■ We have stated that when an informant is a mere transmitter of information and not an active participant in the crime itself, the informant's name need not be disclosed. *State v. Villalon*, 305 Minn. 547, 549, 234 N.W.2d 189, 191 (1975). Further, disclosure of an informant's identity is not generally required when the only participation by the informant in the crime is to bring together the defendant and the government agent. *State v. Werber*, 301 Minn. 1, 7–9, 221 N.W.2d 146, 150 (1974). Specific factors a district court should consider when determining whether disclosure of the identity of an informant is necessary to a fair trial include: (1) whether the informant was a material witness; (2) whether the informant's testimony will be material to the issue of guilt; (3) whether the testimony of the law enforcement officer is suspect; and (4) whether the informant's testimony might disclose entrapment. *Syrovatka v. State*, 278 N.W.2d 558, 561–62 (Minn.1979).

Here, the record indicates that Sergeant Laurence's testimony at issue was not material to Medal–Mendoza's guilt. Specifically, Laurence did not use the informant's statement to prove that Medal–Mendoza had committed the murder, but rather to show the jury how the investigation process proceeded and to explain how she came to identify Medal–Mendoza as a sus-

pect. Further, there is no evidence that would indicate the confidential informant was a material witness to the crime, that Laurence's testimony was suspect, or that the informant's testimony might disclose entrapment. We therefore conclude that the district court did not need to sua sponte exclude the testimony at issue.

Medal–Mendoza last argues that he received ineffective assistance of trial counsel because his attorney (1) failed to object to the above testimony; (2) failed to object to Crosby's testimony; (3) failed to question the police officers' method of investigation; and (4) refused to call certain witnesses. The United States Supreme Court has stated that to succeed in an ineffective assistance of counsel claim, a convicted defendant must show that his counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Here, Medal–Mendoza failed to demonstrate how his trial counsel's alleged failures "fell below an objective standard of reasonableness." *See id.* at 688, 104 S.Ct. 2052. More importantly, as discussed above, the state's case against Medal–Mendoza was very strong, and the record does not indicate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. Accordingly, we conclude that Medal–Mendoza's ineffective assistance of counsel claim also fails.

For the above reasons, we affirm Medal–Mendoza's convictions.

Affirmed.