*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A13-1774**

State of Minnesota,
Respondent,

vs.

Joseph Michael Tuseth,
Appellant.

**Filed October 14, 2014
Affirmed in part and remanded
Stauber, Judge**

Polk County District Court
File No. 60CR122755

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Gregory Alan Widseth, Polk County Attorney, Crookston, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Davi E. Axelson, Assistant
Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Hudson, Presiding Judge; Stauber, Judge; and

Kirk, Judge.

**U N P U B L I S H E D   O P I N I O N**

**STAUBER**, Judge

On appeal from his conviction of felony domestic assault, domestic assault by

strangulation, and felony pattern of stalking conduct, appellant argues that (1) the district

court plainly erred by admitting certain witness testimony; (2) the prosecutor committed

prejudicial misconduct by eliciting improper vouching testimony; (3) he was denied the effective assistance of counsel; and (4) the district court abused its discretion by sentencing him to an upward departure from the presumptive sentence. We affirm appellant's convictions, but remand for resentencing.

**FACTS**

Appellant Joseph Michael Tuseth was charged with felony domestic assault, domestic assault by strangulation, and felony pattern of stalking conduct for allegedly assaulting his girlfriend A.B. in December 2012. At trial, the state presented testimony and other evidence establishing that appellant and A.B. began dating in the summer of 2010, and began cohabitating "right away." A.B. testified that the first time appellant became physically abusive he slapped her across the face, choked her, and threw her belongings in the snow. A.B. also testified that appellant assaulted her again in May 2011. According to A.B., appellant chased her into the bathroom and pushed her against a towel rack, causing her head to bleed. A.B. then attempted to leave the apartment, but appellant grabbed her, lifted her off her feet by her throat, and choked her until she lost consciousness. A.B. further testified that when she began to regain consciousness, she saw appellant wipe her blood off the hallway wall and that when appellant saw that she was conscious, he called her names and kicked her in the ribs, causing a fracture.

For the May 2011 assault, appellant was charged with a number of offenses and later pleaded guilty to domestic assault by strangulation, third-degree assault, and false imprisonment. Appellant was then sentenced to 18 months in prison. While the case was pending, appellant contacted A.B. by telephone in violation of a domestic abuse no

2

contact order (DANCO). Consequently, appellant was charged with and pleaded guilty to two counts of violation of a DANCO.

After appellant was released from prison, he moved in with A.B. at her apartment. But on December 7, 2012, appellant told A.B. that he wanted to end the relationship. The next morning, the two feuded over money before A.B. left for work. Appellant then went to A.B.'s place of work where, according to A.B., she observed appellant consuming alcohol in the parking lot. A.B. also testified that appellant was "in and out calling me a whore and a bitch" before he "eventually" left.

After work, A.B. was home asleep when she awoke to find appellant standing over her, intoxicated and calling her names. A.B. testified that she then went to stay with a friend, L.F., who lived across the parking lot. But when she saw the lights off in her apartment, she assumed appellant had left, so she went back to her apartment to get her pajamas and toothbrush.

Upon reentering her apartment, A.B. observed appellant passed out on the couch in an "uncomfortable" position. According to A.B., she woke appellant up "to see if he wanted to go lay in bed." A.B. testified that appellant responded by calling her a bitch and a whore and accusing her of having sex with a neighbor. Appellant then struck A.B. in the nose, causing blood to "gush[] out." A.B. claimed that when she tried to leave, appellant threw her on the ground and choked her.

Appellant eventually permitted A.B. to leave the apartment. A neighbor, S.K., was in the parking lot when she saw A.B. "run[] outside with blood all over her face and

her clothes." According to S.K., A.B. told her that she had been in a fight with appellant. After S.K. got a towel for A.B.'s face, A.B. returned to L.F.'s apartment.

L.F. testified that when A.B. arrived back at her apartment, "she had blood all over her" and said that appellant had "punched her in the face." In the meantime, S.K. went to A.B.'s apartment because she thought A.B. had gone back home. According to S.K., when appellant let her into the apartment, she observed that the "apartment was kind of beat up, things thrown around, a lot of blood everywhere." S.K. also testified that appellant "had blood all over his body as well." S.K. then left the apartment, found A.B., and took her to the hospital.

At the hospital, A.B. was treated by Dr. Steven Weiser. He observed that A.B. "had a lot of facial trauma," including a "pretty significant amount of swelling to her nose," and an abrasion on her neck. According to Dr. Weiser, A.B. told him that "she was punched in the face, punched in the nose, and she was choked." Dr. Weiser also testified that "it was clinically clear to me that [A.B.] had been assaulted."

Officer Anthony Reznicek testified that he was dispatched to the scene and observed that the "apartment was in disarray" and that there was a "large amount of blood on the floor." Officer Reznicek then heard the shower turn on and soon discovered appellant in the shower. Officer Reznicek called to appellant, and when appellant "looked outside the shower curtain" Reznicek "could see [that] there was blood on [appellant's] upper neck, down his shoulder, and it appeared that [appellant] was trying to wash the blood off of him." Officer Reznicek further testified that appellant was "uncooperative," and "appeared to be intoxicated."

4

B.H., who lived two doors down from A.B., testified that he overheard the argument between appellant and A.B. on December 8, 2012. Although B.H. did not see the argument, he testified that it "sounded like" the male was the "aggressor" and the female was the "victim."

Appellant took the stand in his defense and claimed that the day before the alleged assault, he ended the relationship with A.B. because she was using controlled substances. According to appellant, he had been moving his belongings out of the apartment, which was why the apartment was in disarray. Appellant also testified that he went to the apartment on the evening of December 8 to get "the rest of [his] property," but because he was intoxicated and A.B. was not there, he decided to stay the night and fell asleep on the couch. Appellant testified further that he woke up with A.B. on top of him, slapping him and "freak[ing] out" about him ending the relationship. Appellant claimed that he was disoriented, so he grabbed A.B. and his head accidentally hit her nose. Although he could not see A.B.'s nose bleeding because the apartment was dark, appellant testified that he could feel the blood on his body.

Appellant also testified that after the altercation, A.B. told appellant that he was "screwed," that she was going to call the police, and that he was going back to prison. Appellant claimed that, because he did not want to go back to prison and the blood on his body made it look like he had done something wrong, he got in the shower to wash off the blood. Although appellant believed that police would not credit his side of the story because of his prior convictions, he denied choking and punching A.B. in the face.

5

The jury found appellant guilty of the charged offenses and the district court sentenced on the felony of pattern stalking conviction. The state then requested a 90-month sentence, essentially a double upward departure from the presumptive guidelines sentencing range of 43 months, based upon appellant's criminal-history score of five. The district court stated that it "strongly consider[ed]" a longer sentence, but concluded that a "57 month guideline sentence is the most appropriate given all circumstances." This appeal followed.

## D E C I S I O N

### I.

"Evidentiary rulings rest within the sound discretion of the [district] court and will not be reversed absent a clear abuse of discretion. On appeal, the appellant has the burden of establishing that the [district] court abused its discretion and that appellant was thereby prejudiced." *State v. Amos*, 658 N.W.2d 201, 203 (Minn. 2003) (citation omitted).

Appellant argues that the district court erred by allowing (1) Dr. Weiser to offer "expert opinion testimony" regarding whether A.B. was assaulted and (2) the state to introduce as substantive evidence B.H.'s unsworn statement to an investigating officer that he overheard a woman complaining about being strangled. Appellant argues that because these errors were prejudicial, he is entitled to a new trial.

Because appellant did not object to the district court's admission of the challenged testimony, we review the issue for plain error. *State v. Griller*, 583 N.W.2d 736, 740 (Minn. 1998). Appellant, therefore, "must show that the district court's failure to sua

6

sponte exclude the testimony at issue constituted (1) an error; (2) that was plain; and (3) that affected [appellant's] substantial rights." *State v. Medal-Mendoza*, 718 N.W.2d 910, 919 (Minn. 2006). If these requirements are established, we "will order a new trial only if the error seriously affected the fairness, integrity, or public reputation of judicial proceedings." *State v. Bahtuoh*, 840 N.W.2d 804, 811 (Minn. 2013).

### A. Dr. Weiser's expert testimony

Expert testimony is permitted if the expert's "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Minn. R. Evid. 702. "The basic consideration in admitting expert testimony under rule 702 is the helpfulness test-that is, whether the testimony will assist the jury in resolving factual questions presented." *State v. Grecinger*, 569 N.W.2d 189, 195 (Minn. 1997). "An expert opinion is helpful if the members of the jury, having the knowledge and general experience common to every member of the community, would be aided in the consideration of the issues by the offered testimony." *State v. Bradford*, 618 N.W.2d 782, 793 (Minn. 2000) (quotation omitted).

Here, Dr. Weiser's testimony included several statements opining that A.B. was assaulted. Appellant's defense at trial was that A.B.'s injuries were caused when he "accidentally head-butted [A.B.] after she woke him up from a drunken stupor by slapping and yelling at him." Based on his trial defense, appellant argues that Dr. Weiser's testimony "interfered with the jury's role of resolving the ultimate legal conclusion of whether [appellant] intentionally assaulted [A.B.] or if he accidentally caused her injured nose."

7

Assuming but not deciding that Dr. Weiser's testimony constituted expert-opinion testimony, we conclude that appellant cannot establish that it was plain error to admit it. "Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Minn. R. Evid. 704. The comments to rule 704 explain that the admissibility of opinion testimony depends on whether "the opinion would be helpful to or assist the jury as provided in Rules 701-703." Minn. R. Evid. 704, 1977 comm. cmt. Consequently, an objection that opinion testimony goes to an ultimate issue is, by itself, "not sufficient." *In re Estate of Olson*, 176 Minn. 360, 370, 223 N.W. 677, 681 (1929). Instead, a party objecting to such testimony must show that, in the case of expert-opinion testimony, the testimony "will [not] assist the trier of fact to understand the evidence or to determine a fact in issue." Minn. R. Evid. 702.

The applicable law demonstrates that the pertinent question is whether Dr. Weiser's testimony that A.B.'s injuries were consistent with those of someone who had been assaulted is helpful to the determination of a fact issue. *See* Minn. R. Evid. 701(b). The challenged testimony relates to a simple fact question: whether A.B.'s injuries were the result of an intentional or accidental act. As a result, Dr. Weiser's testimony could reasonably be deemed helpful to the jury. Therefore, it was not plain error for the district court to admit the challenged testimony.

**B.      B.H.'s out-of-court statement**

B.H. testified that he heard a struggle between a man and a woman in A.B.'s apartment, but did not remember any specific words being said by either person. The

8

state did not attempt to refresh B.H.'s memory with his prior statement to police. Later, the state called Officer Kyle Steever, who interviewed B.H. after the incident. According to Officer Steever, B.H. told him that he overheard the woman "state something to the effect of stop choking me or can't breathe, something like that."

A witness's prior inconsistent statements that are not made under oath are generally admissible only for impeachment purposes and not admissible to prove the truth of the matters asserted in them. Minn. R. Evid. 613(b); 801(d)(1)(A). Citing this rule, appellant argues that because B.H.'s prior statement was made during an unsworn police interview, it was not admissible as substantive evidence.

Even if we were to conclude that it was plain error to admit the challenged testimony, appellant is unable to establish that it affected his substantial rights. The record reflects that the evidence offered by the state was strong. A.B. testified in detail regarding the events of December 8, 2012, including appellant's alcohol consumption, his obnoxious behavior at her place of employment, and his later assault at her apartment. She also testified about appellant's prior domestic abuse, and photographs depicting the prior abuse were admitted into evidence. Moreover, photographs of A.B.'s injuries from the December 8 assault, as well as the condition of the apartment, which showed it in disarray with blood everywhere, were shown to the jury. And several other witnesses, including L.F. and S.K., testified that they were told by A.B. that she was assaulted by appellant. In light of the abundant evidence admitted at trial supporting appellant's guilt, he is unable to demonstrate that there is a reasonable likelihood that the outcome of the proceeding would have been different if the challenged testimony was not admitted. *See*

9

*State v. Burg*, 648 N.W.2d 673, 677 (Minn. 2002) ("To show that the error affected substantial rights, the defendant bears the heavy burden of showing that the error was prejudicial-that is, the defendant must show that there is a reasonable likelihood that the error substantially affected the verdict."). Appellant is not entitled to a new trial.

**II.**

Appellant argues that the prosecutor committed misconduct by eliciting improper vouching testimony from Heddan and Officer Reznicek. Because appellant failed to object to the admission of this testimony at trial, the issue is reviewed under a modified plain-error test. *See State v. Carridine*, 812 N.W.2d 130, 146 (Minn. 2012). To meet this test, an appellant must establish that the misconduct amounted to error that was plain. *Id.* If plain error is established, the state has the burden to show that it did not prejudice the appellant's substantial rights. *Id.* This burden is satisfied if the state can show that there is no reasonable likelihood that the misconduct had a significant effect on the jury's verdict. *State v. Ramey*, 721 N.W.2d 294, 302 (Minn. 2006). "Finally, if all three prongs . . . are satisfied, the court determines whether to address the error to ensure fairness and integrity in judicial proceedings." *State v. Cao*, 788 N.W.2d 710, 715 (Minn. 2010).

"The credibility of a witness is for the jury to decide." *State v. Ferguson*, 581 N.W.2d 824, 835 (Minn. 1998) (quotation omitted). "Therefore, one witness cannot vouch for or against the credibility of another witness." *Id.* It is improper for a prosecutor to intentionally elicit vouching testimony during trial. *Van Buren v. State*, 556 N.W.2d 548, 551 (Minn. 1996).

Here, the prosecutor asked B.H., based upon "what [he] could hear," who "appeared to you" to be "the aggressor?" B.H. responded that "[i]t would have been the guy," and the female voice would have been "the victim." The prosecutor also asked Officer Reznicek if, when he responds to assaults, the more "agitated" person "is typically the person that would be the aggressor?" Officer Reznicek responded: "In my experience, yes."

Referring to this testimony, appellant argues that the prosecutor committed misconduct by asking B.H. and Officer Reznicek to vouch for A.B.'s "credibility by testifying whether [appellant] or [A.B.] was the aggressor when neither witness observed the incident happen." But improper vouching testimony is testimony that another witness is telling the truth or that one believes one witness over the other. *Ferguson*, 581 N.W.2d at 835. Nowhere in the challenged testimony does either B.H. or Officer Reznicek state that A.B. was telling the truth or that they believed A.B.'s testimony over appellant's testimony. Because the challenged testimony does not constitute improper vouching testimony, appellant is unable to establish that the prosecutor committed misconduct by eliciting the testimony. Furthermore, even if it was plain error to admit the testimony, there is no reasonable likelihood that the outcome of the proceeding would have been different. Therefore, appellant's claim that he is entitled to a new trial based on prosecutorial misconduct is without merit.

## III.

To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that (1) counsel's performance "fell below an objective standard of

11

reasonableness" and (2) there is a reasonable probability that the outcome would have been different but for counsel's errors. *Andersen v. State*, 830 N.W.2d 1, 10 (Minn. 2013); *see Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984). The burden of proof on this claim rests with the defendant, who must overcome the "strong presumption that counsel's performance fell within a wide range of reasonable assistance." *Gail v. State*, 732 N.W.2d 243, 248 (Minn. 2007). When the defendant fails to prove either counsel's deficient performance or resulting prejudice, the defendant's claim of ineffective assistance of counsel fails. *State v. Blanche*, 696 N.W.2d 351, 376 (Minn. 2005).

Here, appellant was charged with felony domestic assault, which requires proof that appellant committed a domestic assault within ten years of committing two or more "previous qualified domestic violence-related offense convictions." Minn. Stat. § 609.2242, subd. 4 (2012). At trial, the state introduced evidence that appellant was convicted of third-degree assault and violation of a DANCO. Later, the state introduced evidence that appellant was convicted of fifth-degree assault in November 2003. Defense counsel objected to the admission of the conviction, noting that the state had already met its burden on the prior-qualified domestic-related offenses. Defense counsel then indicated that he would stipulate to that element of the offense. The prosecutor, however, declined to enter into the stipulation because "that stipulation would have had to be entered into before we started trial." After a short recess, defense counsel withdrew his request to stipulate, stating that "I didn't realize [the fifth-degree assault conviction was]

part of the charge itself. That being the case, I don't think there is any basis to withhold [it]."

Appellant argues that his "defense counsel was ineffective for failing to stipulate that [he] had two or more previous qualified domestic violence-related convictions." But evidence supporting appellant's guilt was very strong. Thus, even if appellant can establish the first *Strickland* prong, appellant's ineffective-assistance-of-counsel claim fails because he cannot establish that there is a reasonable probability that, but for counsel's errors, the outcome would have been different. *See Blanche*, 696 N.W.2d at 376 (stating that when the defendant fails to prove either counsel's deficient performance or resulting prejudice, the defendant's claim of ineffective assistance of counsel fails).

**IV.**

Appellant challenges the district court's imposition of a 57-month sentence on the assault offense, which is a six-month upward departure from the 51-month top-of-the-box guidelines sentence. This court reviews sentences imposed by a district court for an abuse of discretion. *State v. Delk*, 781 N.W.2d 426, 428 (Minn. App. 2010), *review denied* (Minn. July 20, 2010).

A district court "must pronounce a sentence within the applicable range" for a crime unless "identifiable, substantial, and compelling circumstances" exist to support a departure from the presumptive sentence. Minn. Sent. Guidelines 2.D.1 (2012). The sentencing guidelines contain a nonexclusive list of aggravating factors that may justify a sentencing departure. Minn. Sent. Guidelines 2.D.3.b (2012). If the reasons given for the "departure are legally permissible and factually supported in the record," this court will

13

affirm the departure. *State v. Edwards*, 774 N.W.2d 596, 601 (Minn. 2009). But "a sentencing court has no discretion to depart from the sentencing guidelines unless aggravating . . . factors are present." *State v. Spain*, 590 N.W.2d 85, 88 (Minn. 1999).

Appellant was sentenced for the felony pattern of stalking conviction. Because appellant had a criminal-history score of five, the presumptive sentence for this offense was 43 months, with a presumptive range of 37-51 months. *See* Minn. Sent. Guidelines 4.A., 5.A. (2012). The state, however, requested a sentence of 90 months, which is a greater than double upward departure from the presumptive sentence. Although the defense stipulated that there was a departure factor, counsel for appellant argued for a guidelines sentence.

In deciding to impose a 57-month sentence, the district court stated on the record that

> the Court did very strongly consider sentencing [appellant] to 72 months, 84 months, and at one point in thinking about this file, frankly I thought about sentencing you to 96 months. However, when I do reflect on this file and I do look at the overall charge that did lead to this Count 4, the Court does believe that the 57 month guideline sentence is the most appropriate given all circumstances. The Court does believe that the State's argument is supported certainly factually by the items we've noted here today, by the record that was generated at trial, and by the written submissions that have been made throughout this process.

Appellant argues that because the "district court failed to state reasons on the record to justify an upward departure, and meant to impose a presumptive term, [he] is entitled to be resentenced to the presumptive term to not exceed 51 months." Conversely, the state asserts that the "district court specifically found that the aggravated departure

factor had been proven when it stated that it accepted and adopted the prosecution's argument," and that the district court was properly advised that the correct presumptive range for appellant's conviction was 37-51 months. Therefore, the state argues that appellant's sentence should be affirmed because the "district court clearly intended to depart upwardly by six months when it imposed an executed sentence of 57 months."

Our review of the record reveals that the parties agreed that an aggravating factor was present, and the district court's statements on the record constitute its recognition that an aggravating factor was present. But, although the district court imposed a sentence that was an upward departure, it did not specifically state that it was departing from the presumptive sentence, and it did not give the specific reason for the departure at the time the sentence was imposed. Instead, the district court indicated that a departure was not appropriate and stated that a "guideline sentence is the most appropriate given all the circumstances." This language indicates that the district court intended to impose a guidelines sentence, but misspoke by imposing a 57-month sentence. And as appellant points out, this scenario seems likely in light of the fact that the sentencing worksheet that was before the district court at the time of sentencing mistakenly listed appellant's criminal history score as 8 instead of 5. Consequently, the sentencing worksheet erroneously listed the presumptive sentence as 48 months, with a presumptive range of 41-57 months. Therefore, in light of the uncertainty surrounding the basis for appellant's sentence, we remand for resentencing pursuant to the guidelines range of 37-51 months.

**Affirmed in part and remanded.**