STATE OF MINNESOTA

IN SUPREME COURT

A12-0173
A13-0996

Hennepin County

State of Minnesota,

Respondent,

vs.

Mahdi Hassan Ali,

Appellant.

Gildea, C.J.
Concurring in part and dissenting in part, Page, J.
Concurring in part and dissenting in part, Stras, J.

Filed: October 8, 2014
Office of Appellate Courts

_____

Lori Swanson, Attorney General, Saint Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Jean Burdorf, Assistant County Attorney, Minneapolis, Minnesota, for respondent.

Cathryn Middlebrook, Chief Appellate Public Defender, Lydia Villalva Lijó, Assistant State Public Defender, Saint Paul, Minnesota, for appellant.
_____

S Y L L A B U S

1.      Because the foundation requirements of Minn. R. Evid. 901 and 902 were not satisfied, the court did not abuse its discretion when it refused to admit a birth certificate into evidence at a postconviction evidentiary hearing.

2.      Because opinion testimony relating to surveillance videos was helpful to the jury, the court did not abuse its discretion in admitting this testimony.

1

3. Although the mandatory imposition of a sentence of life without the possibility of release for a juvenile convicted of first-degree premeditated murder violates the rule announced in *Miller v. Alabama*, ___ U.S. ___, 132 S. Ct. 2455 (2012), the district court has the inherent judicial authority to hold a *Miller* hearing on remand.

4. The discretionary imposition of consecutive sentences of life with the possibility of release does not violate the *Miller* rule or Minn. Const. art. I, § 5, and the district court did not abuse its discretion in imposing consecutive sentences in a case in which multiple victims were murdered.

5. Appellant's pro se arguments are without merit.

Affirmed in part, reversed in part and remanded.

O P I N I O N

GILDEA, Chief Justice.

Appellant Mahdi Hassan Ali ("Mahdi")[1] was convicted of one count of first-degree premeditated murder and two counts of first-degree felony murder for shooting and killing three men during a robbery of the Seward Market in Minneapolis on January 6, 2010.[2] We consolidated Mahdi's direct appeal and his postconviction appeal. On appeal, Mahdi raises a series of arguments. First, he challenges the postconviction

---

[1] Because several of the men involved in the events have the last name Ali, we will refer to them all with their first names.

[2] Mahdi was also convicted of two counts of second-degree murder under Minn. Stat. § 609.19, subd. 1(1) (2012) and a count of first-degree felony murder under Minn. Stat. § 609.185(a)(3) (2012), but he was not sentenced on these counts pursuant to Minn. Stat. § 609.035, subd. 1 (2012).

court's denial of postconviction relief. Second, Mahdi argues that the district court erred by allowing opinion testimony relating to surveillance videos that tended to identify him as the gunman. Third, Mahdi argues that the mandatory imposition of a sentence of life without the possibility of release (LWOR) violates the Eighth Amendment's prohibition on cruel and unusual punishment under *Miller v. Alabama*, ___ U.S. ___, 132 S. Ct. 2455 (2012). Fourth, he argues that the district court's discretionary imposition of consecutive sentences violated the rule announced in *Miller* and Article I, Section 5 of the Minnesota Constitution, and that the district court abused its discretion by imposing consecutive sentences. Fifth, Mahdi raises a number of other claims in a pro se supplemental brief. Because we conclude that the postconviction court did not err, the district court did not err in its evidentiary rulings or in imposing consecutive sentences, and Mahdi's pro se arguments lack merit, we affirm on these issues. But because we hold that the mandatory LWOR sentence on the first-degree premeditated murder conviction is unconstitutional under *Miller*, we vacate that sentence and remand for resentencing on the first-degree premeditated murder conviction following a *Miller* hearing.

This case arises from an incident that took place on a January night in 2010. At 7:44 p.m., on January 6, two masked men walked into the Seward Market on East Franklin Avenue in Minneapolis. The first man, who had covered his face with a blue bandana, held a black semiautomatic pistol in his right hand. His accomplice, a taller man whose black-and-white striped shirt poked out from under his winter coat, entered behind him. When the men entered, Osman Elmi, an employee of the market, and Mohamed Warfa, a relative of Elmi's, were sitting behind the store's counter. The man

3

with the gun thrust it in Elmi's face and both Elmi and Warfa put their hands in the air. The man with the gun then pulled Warfa to the ground.

The accomplice went to the back of the store to control a woman who was shopping and an elderly man who had been helping her. When Elmi and Warfa yelled to the woman and the elderly man in the back to call the police, the accomplice demanded in Somali that the man and woman give him their cell phones. The woman lied and said she did not have a cell phone with her. She pleaded with him in Somali, saying "please don't kill us, please, I have children at home, I'm a mother, don't kill us." The accomplice then hit the elderly man.

Surveillance footage shows that customer Anwar Mohammed then entered the market. As soon as Mohammed entered and saw the robbery in progress, the man with the gun shot him two times, including once in the head. The accomplice started to yell in Somali, "Don't kill" or "No killing!" After shooting Mohammed, the man with the gun ran out of the store. Warfa followed him a short distance before returning to the store. The shooter then reappeared and shot Warfa at least twice. Warfa fell, his body holding the door of the market open and the second robber jumped over him and ran out the door. Elmi, who was still inside the store, fumbled for his cell phone after the two robbers left. Before he could complete the call, the shooter returned and chased Elmi through the store. A rack of snacks tipped over and spilled as the two men raced around a corner, before the shooter shot Elmi three times in the back. Surveillance video shows the shooter leaving the store for good at 7:45 p.m., just over a minute after he entered. All three victims died within minutes of being shot.

4

As soon as the shooting started and the second robber started to flee, the woman and the elderly man in the back of the store ran and hid in the store's freezer. The woman called 911. She told the 911 operator that there was a robbery at the market, that she had heard gunshots, and that she was in the freezer at the store. She said, "I'm so scared, I'm so scared. I have six children, I don't want to die." Two Minneapolis police officers responded to the call. As they drove up to the store, they saw two bodies lying in the entryway of the store. When the officers got out of their squad car, they searched the store for the robbers and found a third victim inside. They also found the woman and the elderly man in the freezer, hiding.

A citizen tipster contacted the police department later that night with potentially relevant information. The tipster told police that when he was visiting a friend two weeks earlier at the Seward Towers West apartment building across the street from the market, he ran into a "kid" he knew from the community center. The kid, the tipster said, was talking about committing a robbery and said he wanted to "look into" the Seward Market because it was also a hawala, or money-wiring center, and would presumably have a lot of cash on hand. Although the tipster did not know the kid's name, he told police that he often saw the kid around the apartment building and that the kid drove a black Caprice with a broken window that was parked on the second floor of the building's parking ramp. Minneapolis police sergeants Ann Kjos and Luis Porras, who were assigned to investigate the murders, went to Seward Towers West the night of the murders and found a black Caprice with a broken window. They found out that the parking spot was

5

assigned to apartment 1310, where a woman named Sainab Osman lived with her teenage grandson, Mahdi Ali.

Two days after the murders, on January 8, police received information from another citizen tipster, a high school student. The student said that the day after the murders, a fellow student named Abdisalan Ali ("Abdisalan") told him that he had been present during the Seward Market murders. The student said Abdisalan claimed to have gone into the store with "a kid named Mahdi," that Mahdi had a gun, that Abdisalan was at the back of the store with some customers when he heard a gunshot, and that Abdisalan ran out of the store and had to jump over a body on the floor in front of the doorway.

Police arrested Abdisalan just over two hours after the student tipster came to them, believing that Abdisalan was the man who participated in the robbery by controlling the two customers in the back of the store. Although Abdisalan was initially not forthcoming, he eventually told police that on the day of the murders, he and his cousin, Ahmed Ali ("Ahmed"), spent time with Ahmed's friend, Mahdi Ali.[3] Mahdi picked them up from school in a red Crown Victoria, Abdisalan said, and over the course of the next few hours the three teens went to the Minneapolis impound lot and a SuperAmerica before Mahdi dropped Abdisalan off at home around 6:30 or 7:00 p.m.

Based on that information, police found surveillance video from several stores the three teens visited that afternoon. In the videos from the SuperAmerica, police saw a red Crown Victoria pull up to a gas pump. Someone got out of the passenger seat of the car

---

[3]     Ahmed Ali and Abdisalan Ali are cousins, but neither of them is related to Mahdi Ali.

and entered the store. Once he entered, police could see a black-and-white striped shirt poking out from underneath his jacket. When he turned and looked at one of the surveillance cameras, police immediately noticed that it was not Abdisalan in the black-and-white shirt. After police saw the video, they believed that the person in the SuperAmerica video was not Abdisalan but was the unidentified accomplice at the back of the Seward Market when the shootings happened. The police then asked Abdisalan more questions about his cousin, Ahmed.

Later that night, police also arrested Mahdi. After the police read him his *Miranda* rights,[4] Mahdi denied knowing anything about the murders at the Seward Market. As police slowly confronted him with evidence of his activities with Abdisalan and Ahmed over the day, Mahdi admitted to going to the gas station and the impound lot with Abdisalan and Ahmed, but he never admitted to playing a role in the murders. Police also searched Mahdi's apartment that night, and found blue jeans in his closet with blood, from one of the victims, on the cuff.

After police talked to Abdisalan and ruled him out as a suspect, his cousin, Ahmed, turned himself in to police. Once he had an attorney and worked out a deal with the State,[5] Ahmed admitted his role in the murders and verified that he was trying to control the customers in the back of the store when Mahdi started shooting.

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[5] Ahmed eventually pleaded guilty and was convicted of three counts of attempting to commit aggravated robbery in the first-degree under Minn. Stat. § 609.245, subd. 1 (2012). He was sentenced to three consecutive 6-year sentences.

From the three men's statements to police, surveillance videos, and witness testimony, police were able to construct a picture of what happened on the afternoon of the murders. On January 6, Mahdi picked Ahmed and Abdisalan up from school in a red Crown Victoria that Mahdi was borrowing from an acquaintance. They went to a gas station so Mahdi could buy something, and then Mahdi dropped the cousins back off at school because Mahdi had to drive the owner of the car to work. Mahdi returned for the cousins 10 to 15 minutes later. The three teenagers then drove to the Wilson's Leather coat factory outlet in North Minneapolis, where Abdisalan stole a faux suede Sean John jacket with fur around the collar. He threw the jacket he was wearing before—a big, dark coat with a hood on it—in the car, and put on his new jacket.

Mahdi drove all three of them to the Minneapolis impound lot to retrieve his car, but they left after Mahdi discovered he did not have enough money. After another trip to a gas station, they went to the Dahabshiil money transfer business near the corner of East Franklin Avenue and Nicollet Avenue South. Mahdi, who had since put on the old coat that Abdisalan had left in the car, planned to rob the business, although Ahmed later testified that he objected to the plan. Mahdi and Ahmed went into the money transfer business but eventually left without robbing it. Abdisalan then asked Mahdi and Ahmed to drop him off at home, and they did so.

Mahdi and Ahmed drove back to the neighborhood where Mahdi lived, near the Seward Market. Ahmed later testified that Mahdi started talking about doing "a mission or something." Mahdi said he knew a place that had "a lot of money," and that if they robbed it, Mahdi could get enough money to get his car out of the impound lot and then

8

he would give the car to Ahmed. Ahmed testified that he resisted this plan at first, because he had "never done anything like that before," so he "wasn't really down with it in the beginning," but he eventually agreed. Ahmed testified that Mahdi gave him a black ski mask that covered everything but his eyes, while Mahdi used a light blue bandana to cover his face. Before they entered, Mahdi told Ahmed that his job was to "hold anybody that's in the back," and "keep them in a place where he can see them." Ahmed testified that when they got back in the car after the shootings, he asked Mahdi why he shot those people. He said Mahdi said, "they knew," meaning that they knew who he was.

On February 4, 2010, a grand jury indicted Mahdi on three counts of premeditated murder in the first degree under Minn. Stat. §§ 609.185(a)(1), 609.11, 609.106, subd. 2(1), 609.05 (2012), for the deaths of Mohammed, Warfa, and Elmi, as well as three counts of felony murder in the first degree while committing or attempting to commit aggravated robbery under Minn. Stat. §§ 609.185(a)(3), 609.11, 609.05. Because the State alleged that Mahdi committed first-degree murder while over the age of 16, Mahdi was automatically certified to stand trial as an adult. *See* Minn. Stat. §§ 260B.007, subd. 6(b), 260B.101, subd. 2 (2012).

On March 9, 2010, Mahdi moved to dismiss the indictment for lack of jurisdiction. Although Mahdi consistently stated and listed his birth date as January 1, 1993, and obtained a driver's license before the murders, he said that his real name was Kahlid Farah Arrasi and that he was actually 15 at the time of the crime. If Mahdi was 15 at the time of the murders, the juvenile court would not automatically lose jurisdiction over

9

him. Minn. Stat. §§ 260B.007, subd. 6(b), 260B.101, subd. 2. After a 3-day age-determination hearing, the district court denied Mahdi's motion to dismiss for lack of jurisdiction, finding that "the preponderance of the evidence establishes that the Defendant Mahdi Hassan Ali had reached the age of sixteen years before January 6, 2010." On appeal, we confirmed that when the defendant's age determines whether the court has jurisdiction, the State has the burden of proving the defendant's age on the date of the offense by a preponderance of the evidence. *State v. Ali*, 806 N.W.2d 45, 54 (Minn. 2011).

Mahdi's trial took place over two weeks in September 2011. On September 23, the jury found Mahdi guilty of one count of first-degree premeditated murder, two counts of second-degree murder, and three counts of first-degree felony murder while committing or attempting to commit aggravated robbery. On October 31, 2011, the district court sentenced Mahdi to two life sentences with the possibility of release after 30 years for the first-degree felony murders of Mohammed and Warfa, and a mandatory LWOR sentence for the first-degree premeditated murder of Elmi. Mahdi appealed his conviction to this court, but on September 20, 2012, we granted his motion to stay the appeal to allow Mahdi to pursue postconviction proceedings.

On October 22, 2012, Mahdi petitioned the postconviction court for an evidentiary hearing to renew his challenge to the district court's jurisdiction, alleging that there was "new evidence establishing that petitioner was 15 years old on the offense date and that the juvenile court therefore had exclusive jurisdiction of his case." Specifically, Mahdi

10

alleged that he had found his birth certificate, which proved that "Khalid Farah Arase was born to Sainab Said Osman in the Malindi District Hospital on August 25, 1994."[6]

Although the postconviction court granted Mahdi's request for an evidentiary hearing, it refused to admit the birth certificate into evidence because Mahdi had not established a proper foundation for it.[7] Without the birth certificate, the court concluded that there was no evidence to support Mahdi's petition and the court denied it. Mahdi filed a motion with this court to vacate the stay of his direct appeal and to consolidate it with an appeal from the postconviction court's order. We granted that request.

I.

We turn first to Mahdi's contention that the postconviction court erred in denying his petition for postconviction relief. Mahdi advances three arguments to support his argument that the court erred. First, he argues that the postconviction court improperly excluded his birth certificate as evidence. Second, he argues that the postconviction court improperly relied on the "law of the case" doctrine to assert that our court had already held that the district court had subject matter jurisdiction over Mahdi, so the postconviction court could not reconsider whether it had jurisdiction. Third, he argues

---

[6] During Mahdi's initial age-determination hearing, DNA evidence was introduced confirming that Osman, whom Mahdi had previously believed to be his grandmother, was really his mother.

[7] As an alternative ground for excluding the birth certificate, the postconviction court found that the birth certificate could have been introduced at the original age-determination hearing if not for a "lack of diligence" on the part of Mahdi and his family. Because we affirm the postconviction court's ruling that excluded the birth certificate, we need not address this alternative ground.

11

that even if the law of the case doctrine were to apply, the postconviction court improperly held that the birth certificate did not fall under the "new evidence" exception to the law of the case doctrine.

With respect to Mahdi's argument that the postconviction court erred when it determined that the birth certificate was inadmissible, our review is for an abuse of discretion. *State v. Brown*, 739 N.W.2d 716, 720 (Minn. 2007). The postconviction court concluded that the birth certificate was not relevant because Mahdi did not establish that the document at issue was actually Mahdi's birth certificate. While the postconviction court couched its evidentiary ruling in terms of relevance, the focus of the court's ruling relates to the evidentiary requirement of foundation. Specifically, the court held that the birth certificate was not admissible because Mahdi had not established that the document offered was Mahdi's birth certificate.

A finding that "the matter in question is what its proponent claims" is a condition precedent to the admissibility of evidence in Minnesota. Minn. R. Evid. 901(a). Foundation can be established in either of two ways: through extrinsic evidence, as contemplated by Minn. R. Evid. 901 (Rule 901); or by a finding that the evidence is "self-authenticating" under Minn. R. Evid. 902 (Rule 902). Because, as discussed below, Mahdi did not establish adequate foundation for the birth certificate, the postconviction court did not abuse its discretion when it determined that the birth certificate was inadmissible.

## A.

Under Rule 901, the authenticity of proffered evidence may be established through extrinsic evidence, including "[t]estimony that a matter is what it is claimed to be." Minn. R. Evid. 901(b)(1). To establish that the birth certificate offered by Mahdi was in fact his birth certificate, Mahdi presented testimony by his mother, who testified that when Mahdi was born, he was named Khalid Farah Arase. She also testified that she was present when Mahdi's birth certificate was filled out, that it was laminated in plastic when she received it soon after from the issuing authorities, and that she recognized the proffered birth certificate as the birth certificate she was given in the hospital following Mahdi's birth. Mahdi also relied on earlier testimony by a social worker that in 2005, Mahdi told child protection workers that his name was not Mahdi Ali. Mahdi reportedly used a number of different names during his interactions with child protection workers, including "Khalid Arrasi."

The postconviction court determined that Mahdi failed to present any credible evidence tying him to the proffered birth certificate. The court explained that the testimony of Mahdi's mother was "contradicted by the physical condition of the paper document which indicates it must have been laminated long after being issued." The court also questioned her ability to identify the birth certificate when she was unable to read or write. Moreover, the court made a specific finding that Mahdi's mother was "not a credible witness." With regard to Mahdi's earlier use of the name Khalid Farah Arrasi, the court found that the name on the birth certificate was spelled differently and there were no "fingerprints, footprints or other biometrics" to tie the birth certificate to Mahdi.

On appeal, Mahdi challenges the postconviction court's conclusion that he failed to present any credible evidence tying him to the birth certificate. Specifically, Mahdi argues that there was "ample evidence that the birth certificate was for [Mahdi]," including the evidence that Mahdi told child protection workers as early as 2005 that his name was not Mahdi Ali. We are not persuaded.

We review a postconviction court's credibility determinations under the clearly erroneous standard. *See Tscheu v. State*, 829 N.W.2d 400, 403 (Minn. 2013). In order for a credibility determination to be clearly erroneous, we must "be left with the definite and firm conviction that a mistake has been made." *State v. Evans*, 756 N.W.2d 854, 870 (Minn. 2008) (citation omitted) (internal quotations marks omitted). This standard creates a "high threshold." *State v. Williams*, 842 N.W.2d 308, 313 (Minn. 2014).

Based on our review of the record, we conclude that Mahdi has not demonstrated that the postconviction court's finding that he failed to present any credible evidence tying him to the proffered birth certificate was clearly erroneous. There is reasonable evidence to support the court's finding, including the physical evidence contradicting the testimony of Mahdi's mother, the different spelling of the name on the birth certificate, and the lack of any fingerprints, footprints, or other biometrics tying the birth certificate to Mahdi. Consequently, we hold that the postconviction court did not abuse its discretion when it determined that the birth certificate was not admissible under Rule 901.

14

B.

The fact that Mahdi failed to establish sufficient foundation for the birth certificate under Rule 901 is not dispositive of the foundation issue, however, because Rule 902 allows a court to admit "self-authenticating" documents without any extrinsic evidence of authenticity. Domestic public documents are self-authenticating if they bear one of the enumerated official seals *and* a signature purporting to be an attestation or execution. Minn. R. Evid. 902(1). Foreign public documents are not self-authenticating unless they satisfy an additional requirement, specifically "a final certification as to the genuineness of the signature and official position . . . of the executing or attesting person."[8] Minn. R. Evid. 902(3). Rule 902(3) provides a list of persons who may make a final certification of genuineness, including "a diplomatic or consular official of the foreign country assigned or accredited to the United States." *Id.*

The birth certificate offered by Mahdi bore a seal and a signature purporting to be an attestation or execution by the Malindi District Registrar.[9] And defense counsel submitted an unsigned letter from the Kenyan Embassy in Washington, D.C., stating that the birth certificate "bears the Seal of the Registrar of Births and Deaths of the Republic

---

[8] Rule 902(3)(B) provides an alternative means of satisfying the final certification requirement, but that provision is not at issue in this case.

[9] As the postconviction court noted, "the seal on the back" of the birth certificate did "not certify that the document is a true copy or that the signature on the document was made by someone authorized to do so."

15

of Kenya." The letter did not identify the name or position of the person at the embassy who reviewed the birth certificate.

The postconviction court concluded that Mahdi failed to satisfy the final certification requirement of Rule 902(3)(A), because the letter was unsigned and did not identify the name or position of the person who reviewed the birth certificate.[10] The court also noted that the seal on the back of the birth certificate did not certify that the signature on the document was made by someone authorized to execute the document.

On appeal, Mahdi argues that the postconviction court abused its discretion when it determined that the birth certificate was not self-certifying. More specifically, he contends that he satisfied Rule 902(3) by "present[ing] information to the court of a Kenyan birth certificate that was issued by the Registrar of Births and Deaths of the Republic of Kenya, as certified by a specific Kenyan Embassy official who reviewed and authenticated the document." Although defense counsel seems to have done her utmost to get the embassy to provide the information she needed, the record supports the court's

---

[10] Several days after the postconviction evidentiary hearing, defense counsel attempted to supplement the record with an affidavit. In defense counsel's affidavit, she averred the following facts. Embassy staff told her that the unsigned certification letter was drafted by a man named Dennis Muhambe. Counsel wrote to Muhambe requesting confirmation of his position and his review of the birth certificate. Several days after the postconviction hearing, counsel received a copy of the original certification letter, with a business card for Muhambe attached by paper clip. Defense counsel submitted the business card to the postconviction court a few days after the hearing. The postconviction court did not expressly address, what, if any, effect the business card had on its analysis. We need not decide whether the attachment of Muhambe's business card to a copy of the unsigned certification letter was sufficient to establish name or position of the person who reviewed the birth certificate for purposes of Rule 902(3), because, in any event, the unsigned certification letter failed to attest to the "genuineness" of the signature and official position of the Malindi District Registrar.

16

determination that Mahdi failed to establish the name and position of the person who reviewed the birth certificate at the embassy. Moreover, even if Mahdi had established the name and position of the person who reviewed the birth certificate, the certification letter still fails to satisfy the requirements of Rule 902(3) because it attests to the genuineness only of *the seal* of the Registrar of Births and Deaths of the Republic of Kenya, not the genuineness of *the signature and official position* of the Malindi District Registrar.

In sum, the record supports the postconviction court's determinations that Mahdi failed to satisfy the requirements of Rules 901 and 902(3). Consequently, the postconviction district court did not abuse its discretion when it determined that the proffered birth certificate was inadmissible.[11] Without the birth certificate, Mahdi has no support for his contention that he is entitled to postconviction relief. Accordingly, we hold that the postconviction court did not err in denying Mahdi's petition.

## II.

We next turn to Mahdi's argument that the district court abused its discretion by allowing two different types of opinion testimony relating to the surveillance videos. First, Mahdi argues that the court erred by permitting police to testify that, based on their

---

[11]  As noted above, Mahdi also challenges the postconviction court's determination that the law of the case doctrine prevented it from reconsidering its conclusion as to Mahdi's age, and argues that if the law of the case doctrine applies, the birth certificate is "new evidence" that operates as an exception to the law of the case doctrine. Because these alternative arguments depend on a determination that the birth certificate was admissible, and we have affirmed the postconviction court's refusal to admit the certificate, it is not necessary for us to reach these alternative arguments.

17

review of some of the videos, they eliminated Abdisalan as one of the two assailants who entered the Seward Market, and they determined that Ahmed was the shooter's accomplice. Second, he argues the court erred by allowing testimony by the forensic experts who digitally clarified the surveillance videos to testify about the similarities between clothing, build, skin tone, and shoes of the people in the surveillance videos. In both instances, Mahdi contends the testimony was inadmissible because it failed to meet the helpful-to-the-trier-of-fact requirements of Minn. R. Evid. 701 (Rule 701) and 702 (Rule 702).[12] We consider the disputed testimony separately.

A.

When police were investigating the Seward Market murders, they relied heavily on surveillance footage from a variety of businesses to help build a timeline for the robbers' activities that day. Police used video from the impound lot, a SuperAmerica, a money transfer business, a hospital, and importantly, the Seward Market to help construct what happened.

Before trial, Mahdi filed a motion to exclude opinion testimony by law enforcement officers "as to [the] identification of the defendant on surveillance video."

---

[12] Rule 701 governs opinion testimony by lay witnesses. It provides that "[i]f the witness is not testifying as an expert, the witness' testimony in the form of opinion or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Minn. R. Evid. 701. Rule 702 governs opinion testimony by expert witnesses. It provides "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Minn. R. Evid. 702.

18

The district court granted Mahdi's motion in part, ruling that the State could not ask the officers if they currently had an opinion as to whether the person in the surveillance videos was Mahdi. Nevertheless, the court concluded that "with the appropriate foundation" the police officers should be allowed to testify about the conclusions they drew during the investigation period after watching the surveillance video for the limited purposes of explaining (1) "why the police focused on [Mahdi]," and (2) "why the investigation proceeded as it did." To ensure the limited use of such testimony, the court indicated that it would be "willing to give a limiting instruction" to the jury "to draw its own conclusion as to whether the person in the video tape is in fact the defendant."

At Mahdi's trial, Sergeant Ann Kjos testified that after police saw the SuperAmerica video, they identified the man in the video as the shooter's accomplice:

Q:      Did you have an opinion as to whether the person in the video, then in the SuperAmerica that's just been admitted, was involved in the Seward Market shootings?

A:      Yes.

Q:      What was that opinion?

Def:    Objection, Your Honor, 701, 702.

Q:      Sergeant, limit your testimony to what you thought at the time you viewed the video and what conclusions you drew then and then only.

A:      At that time when I saw the gentleman from the SuperAmerica, I at that time, I believed that he was the person that had entered the store, the Seward Market, and had gone to the back of the store to control the customers.

19

Sergeant Kjos next said that police eliminated Abdisalan, Ahmed's cousin, as the shooter's accomplice after viewing video from the impound lot and the SuperAmerica.

Q: Did you eventually take Abdisalan home?

A: I did.

Q: Why did you take him home?

A: After seeing the video from both the SuperAmerica and the impound lot, I believed at that time that Abdisalan was not one of the two people – was not either of the two people that had entered the Seward Market with the intention of robbing them and eventually killing three men.

After defense counsel objected, the district court issued the following jury instruction:

Court: Members of the jury, any statement made by the witness regarding the state of mind of other people is to be disregarded by you. In addition, the Sergeant's conclusions regarding who's depicted in various videos are to put the investigation of this case into context. You are to draw your own conclusions based on all the evidence on who might be in any of the videotapes that are in evidence at this time.

On appeal, Mahdi argues that the district court erred by allowing this testimony because it is not admissible under Rule 701 or 702, and that the district court's assertion that it would "help the jury understand why police focused on appellant" was not accurate considering the course of the investigation. The State, however, argues that Sergeant Kjos's testimony was properly admitted to provide context for the police investigation. Evidentiary rulings rest within the sound discretion of the district court, and we will not reverse an evidentiary ruling absent a clear abuse of discretion. *State v. Medal-Mendoza*, 718 N.W.2d 910, 917 (Minn. 2006).

20

We have made clear that evidence is generally admissible to give jurors the context for an investigation. *State v. Griller*, 583 N.W.2d 736, 743 (Minn. 1998). In *Griller*, we considered the appeal of a man convicted of murdering someone and then burying the victim in his backyard in northeast Minneapolis. *Id.* at 738-39. We held that the district court did not abuse its discretion in admitting testimony about a letter sent to the Sioux Falls Police Department that started the investigation or the content of police interviews with neighbors. *Id.* at 743. The testimony "provided the jury with the context necessary to explain how the investigation against Griller began and why the police were excavating [Griller's] backyard." *Id.*; *see also State v. Czech*, 343 N.W.2d 854, 856 (Minn. 1984) (affirming the admission of evidence of an undercover investigation of the defendant because the evidence could show "the context of the conversation; that is, why the undercover agents were talking with defendant").

Mahdi argues that the district court's rationale that the police testimony "would help the jury understand why police focused on appellant," was "not consistent with the facts" because police received the first citizen tip within hours of the shootings that led them to Mahdi's car in the Seward Towers West parking ramp. By the time police saw the videos, he argues, they had already identified Mahdi as a suspect "and gathered sufficient probable cause to arrest him and obtain a magistrate-approved search warrant." Mahdi's argument suggests that evidence is admissible to show the context of an investigation only when it is evidence that first made police suspect that the defendant may have been involved in a crime. But our cases do not draw such a fine distinction on *how* the information must have affected the investigation.

21

As the State notes, the evidence from police was important context evidence in this case considering that Mahdi's defense was centered on the contention that he had been misidentified and someone else shot the three men at the Seward Market. Mahdi's attorney began his opening statement by saying: "Misidentification. That's what this case is about." He similarly began his closing statement by saying, "Misidentification. That's what I told you this case would be about last Monday, and that's what we've seen." Without police being able to testify as to *why* they ruled out Abdisalan, a possible alternate perpetrator, the jury might have wondered why police did not further investigate Abdisalan and why police decided to focus the investigation on Mahdi as the possible shooter in the Seward Market.

Importantly, the district court gave a limiting instruction to make sure the jury did not improperly rely on the evidence. The court reminded the jury that "the Sergeant's conclusions regarding who's depicted in various videos are to put the investigation of this case into context," and that the jury is supposed to "draw [its] own conclusions based on all the evidence on who might be in any of the videotapes that are in evidence at this time." Jurors are presumed to follow limiting instructions with respect to the proper use of evidence, and Mahdi has not provided any reason to doubt that the jurors followed the instructions here. *See State v. Fardan*, 773 N.W.2d 303, 320 (Minn. 2009). We hold that in the context of the trial, the district court did not abuse its discretion in allowing Sergeant Kjos to testify that once she and her partner viewed the surveillance videos, they

22

eliminated Abdisalan as one of the two assailants who entered the market and determined that Ahmed was the accomplice at the Seward Market who did not have a gun.[13]

B.

Before trial, Mahdi also filed a motion to exclude the testimony of two forensic experts who worked for Target Corporation when police were investigating the murders. Target has an accredited crime laboratory. The lab was created to investigate the company's problems with organized retail crime, but it also does pro bono work for local law enforcement. Minneapolis police detectives asked the lab to help investigate the Seward Market shootings by examining surveillance footage. Mahdi argued that the testimony at issue was not admissible as expert testimony under Rule 702 because it was not "helpful" to the jury. Specifically, Mahdi argued that "the jury is in as good a position to look at the photographs and draw conclusions from them as Target Forensics, [and so] the testimony of the Target Forensic witnesses would be of little assistance to the jury and should not be admitted."

At a pretrial motion hearing, the district court denied Mahdi's motion to exclude the testimony of the forensic experts. Noting that some of the surveillance videos "were

---

[13] In the alternative, Mahdi argues that the testimony must be excluded because it is not admissible as either lay or expert opinion testimony under Rules 701 and 702. Mahdi's argument fails because he is ignoring the rule of "multiple admissibility," which holds that "although a piece of evidence is inadmissible under one rule for the purpose given in offering it, it is nevertheless admissible if relevant and offered for some other purpose not forbidden by the rules of evidence." *Black's Law Dictionary* 56 (10th ed. 2014); *see also State v. Wermerskirchen*, 497 N.W.2d 235, 239 (Minn. 1993). Even if Sergeant Kjos's testimony was actually inadmissible under Rule 701 or 702, an issue we need not decide, it was properly admissible for the purpose of providing context for the investigation.

digitally manipulated to clarify details in the tape," the court said it was "necessary that the digital evidence technicians testify to say what was done and how it affects the accuracy of the image that is portrayed." The court said it was "appropriate that they testify and be able to point out similarities between clothing, build, skin tone, shoes," and that the experts were "also under the obligation to testify that those similarities are not caused by the digital clarification process." The court also noted that if some differences in the tapes are "explainable by factors other [than] the items or persons being different items," the experts should be "allowed to explain why."

For example, the court said:

[T]he lighting, the aspect ratio, whatever goes into their opinion about why it might appear differently. That generally is not within the province of the normal juror as to how lighting and other factors on a video tape could affect the appearance of items from one video tape to the next.

The court also placed limits on the Target forensic experts' testimony:

These witnesses may not . . . testify that they are in fact the same clothing or the same persons. They can point out similarities. They can say why they are similar and whether it was caused by their digital manipulation of the evidence or not. They may point out differences and explain why they appear to be different. They may not offer opinion that they are in fact the same clothing or same person's [sic] depicted in the various video tapes.

Target forensic expert Jimmy Schroering testified on September 15, 2011. He told the jury that he "performed enhancements to the images that [he] extracted" from videos from the impound lot, the SuperAmerica, the Dahabshiil check cashing facility, and the Seward Market. He said he compared the shooter in the Seward Market videos to people appearing in the videos from the other three locations.

Schoering pointed out several similarities between the person identified as Mahdi Ali[14] in various photos from the impound lot and the Dahabshiil check cashing center, including cuffs in the jeans, the color of his shoes, his skin tone, and his "general build." Schoering testified that the person identified as Mahdi Ali in the impound lot video "could not be eliminated as being the same as the individual holding the weapon in the Seward Market." But he also said that despite the fact that the person later identified as Ahmed Ali had "no significant characteristics other than general skin tone" in common with the shooter in the Seward Market video, Ahmed "also could not be eliminated as being the same as the individual with the weapon in the Seward Market." He also testified that the person later identified as Mahdi Ali in the video from the Dahabshiil check cashing center had "similar build, similar general skin tone . . . shoes, and the cuffing on the jeans" in common with the Seward Market shooter. Schoering testified that the person identified as Mahdi Ali in the Dahabshiil video "could not be eliminated as being the same as the individual holding the weapon in the Seward Market." Schoering also testified at length about how variations in video quality and lighting could cause variations in the images that the jury saw.

The second Target forensic expert to testify was Jacob Steinhour. Steinhour was asked to compare pictures of pants that the Minneapolis police recovered at Mahdi Ali's

---

[14] In an interview with police, Mahdi identified himself in the video from the impound lot. An audio recording from that interview was played for the jury. When he testified, Ahmed also identified himself, Mahdi, and Abdisalan in videos from the impound lot, the SuperAmerica, the Dahabshiil money transfer center, and the Seward Market.

apartment with the images of pants that were recorded in the various surveillance videos. Steinhour pointed out various details in the pants that were apparent in the surveillance videos, such as contrast in the fabric on one of the thighs. In the end, Steinhour testified that he could not conclude whether the pants matched.

On appeal, Mahdi argues that the testimony of the Target analysts was inadmissible under Rule 702. He does not challenge the portion of the testimony from the analysts about how they extracted video and used technology to clarify some of the images. Rather, he argues that the district court improperly admitted "testimony comparing the gunman to a specific individual in the other videos and comparing the cuffed jeans to jeans worn by the gunman and in the other videos."

Rule 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise." Expert testimony is "only admissible if the testimony will help the trier of fact in evaluating evidence or resolving factual issues." *State v. Medal-Mendoza*, 718 N.W.2d 910, 917 (Minn. 2006).

Mahdi cites a variety of federal cases that affirmed the exclusion of similar testimony on the basis that it would not be "helpful" to the jury and therefore was not the proper subject of expert opinion testimony. *See, e.g.*, *United States v. Dorsey*, 45 F.3d 809, 812-15 (4th Cir. 1995) (affirming a trial court's decision to exclude the testimony of two experts who were going to say that the defendant was not the individual depicted in bank surveillance photographs because it would not be helpful to the jury); *United States*

*v. Brewer*, 783 F.2d 841, 842 (9th Cir. 1986) (affirming a trial court's decision to exclude testimony from an expert that the defendant was not the robber depicted in surveillance photographs). But these cases do not categorically hold that the evidence would not actually help the jury, only that the trial courts in these cases did not abuse their discretion in concluding that the evidence would not help the jury. *See Dorsey*, 45 F.3d at 812 ("We find that under an abuse of discretion standard, the district court did not err."); *Brewer*, 783 F.2d at 842 ("[T]he trial court's ruling on this evidence was not manifestly unreasonable . . . .").

Here, the district court concluded that the testimony would assist the jury because the videos reflected "similarities between clothing, build, skin tone, shoes," and the experts had an "obligation to testify that those similarities are not caused by the digital clarification process." Although some of these similarities are readily apparent from watching the surveillance videos, our review of the videos confirms that some of the finer details required expertise and were not within the knowledge of an average juror. For example, one of the Target analysts testified that by using the camera angle and distance from the camera, it is possible to tell that one suspect is taller than the other. The district court determined this sort of testimony would help the jury, and we hold that the court did not abuse its discretion in reaching that determination.[15]

---

[15] Because we determine that the district court did not abuse its discretion in admitting the testimony of the Target forensic experts under Rule 702, we do not need to consider Mahdi's contention that the forensic experts lacked firsthand knowledge and therefore that their testimony was inadmissible under Rule 701.

27

III.

We turn next to Mahdi's contention that the mandatory imposition of a sentence of life without the possibility of release (LWOR) for his first-degree premeditated murder conviction violated the Eighth Amendment to the U.S. Constitution because it constitutes cruel and unusual punishment. Mahdi's argument is based on *Miller v. Alabama*, in which the Supreme Court held that, as applied to juveniles, sentencing schemes mandating LWOR violate the Eighth Amendment's prohibition on cruel and unusual punishment. ___ U.S. ___, 132 S. Ct. 2455, 2460 (2012). The Court did not categorically prohibit LWOR sentences but rather required that before imposing such sentences, "a judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles." *Id.* at ___, 132 S. Ct. at 2475. Among the factors to be considered are the juvenile's "immaturity, impetuosity, and failure to appreciate risks and consequences." *Id.* at ___, 132 S. Ct. at 2468.

Mahdi's 2011 conviction for premeditated murder in the first degree under Minn. Stat. § 609.185(a)(1) (2012) carries a mandatory LWOR sentence under Minnesota's "heinous crimes" statute.[16] *See* Minn. Stat. § 609.106, subd. 2(1) (2012). Mahdi argues that under *Miller*, the mandatory imposition of a LWOR sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment to the U.S. Constitution. *See*

---

[16] In a footnote, the Supreme Court in *Miller* cited to Minnesota's "heinous crimes" statute, Minn. Stat. § 609.106, as an example of a statute that, when applied to juveniles, impermissibly mandates life without parole without first considering the defendant's age. *Miller*, ___ U.S. at ___, 132 S. Ct. at 2473 n.13.

U.S. Const. amend. VIII. The State concedes that in Mahdi's case, the mandatory imposition of a LWOR sentence violates the Eighth Amendment under *Miller*. We agree with the parties.

We have held that *Miller* is a new rule of constitutional criminal procedure. *Chambers v. State*, 831 N.W.2d 311, 326-28 (Minn. 2013). Such rules apply to cases pending on direct review at the time the new rule is announced. *State v. Osborne*, 715 N.W.2d 436, 441 (Minn. 2006). Because Mahdi's conviction was not yet final on direct review when *Miller* was decided, *Miller* applies to Mahdi's case. *See Teague v. Lane*, 489 U.S. 288, 300-10 (1989). We therefore reverse the mandatory imposition of the LWOR sentence imposed on Mahdi for his first-degree premeditated murder conviction.

## A.

The parties agree that the sentence was unconstitutional, but they disagree as to how to proceed with sentencing on the first-degree premeditated murder conviction. The State argues that *State v. Chauvin*, 723 N.W.2d 20 (Minn. 2006), makes clear that, in the absence of legislative action, district courts have the inherent judicial authority to conduct a judicial proceeding that is necessary to preserve the constitutionality of a legislative sentencing scheme, and therefore we should remand to the district court for resentencing following a *Miller* hearing. Mahdi contends that *Miller* requires us to declare the 2005 amendment to Minn. Stat. § 609.106 (adding premeditated murder to the list of offenses

that mandate the imposition of a LWOR sentence)[17] unconstitutional, and revive the most recent version of the legislature's sentencing scheme that passes constitutional muster in accordance with *Fedziuk v. Commissioner of Public Safety*, 696 N.W.2d 340 (Minn. 2005). According to Mahdi, the most recent sentencing scheme to pass constitutional muster requires us to resentence him to life with the possibility of release after 30 years. *See* Minn. Stat. §§ 244.05, subd. 4, 609.106, 609.185 (2004).

Whether the remedy in this case is controlled by *Chauvin* or *Fedziuk* presents a question of law that is informed by review of the several principles that help to define a district court's authority in the sentencing arena. First, the Legislature has the power to define the punishment for crimes (including the terms of confinement and parole), and the courts are the executor of that legislative power. *State v. Osterloh*, 275 N.W.2d 578, 580 (Minn. 1978) (citing *State ex rel. Ahern v. Young*, 273 Minn. 240, 243, 141 N.W.2d 15, 17 (1966)). Second, the separation of powers doctrine requires that " '[j]udicial sentencing must strictly adhere to statutory authorization.' " *State v. Mitchell*, 577 N.W.2d 481, 493 (Minn. 1998) (quoting *State v. Jonason*, 292 N.W.2d 730, 733 (Minn. 1980)). Third, a court has inherent judicial authority to engage in activities that are necessary to the performance of judicial functions, but "the judiciary is not to resort to inherent authority when doing so would not 'respect the equally unique authority of' another branch of government." *State v. M.D.T.*, 831 N.W.2d 276, 280, 282 (Minn. 2013) (quoting *State v. C.A.*, 304 N.W.2d 353, 359 (Minn. 1981)). Keeping these

_____

[17]    *See* Act of June 2, 2005, ch. 136, art. 2, § 5, 2005 Minn. Laws 901, 922 (codified at Minn. Stat. § 609.106, subd. 2(1) (2012)).

principles in mind, we consider whether *Chauvin* or *Fedziuk* controls the remedy in this case.

In *Chauvin*, the State charged the defendant with felony theft by swindle and provided him with notice that it intended to seek an enhanced sentence under Minn. Sent. Guidelines II.D.2b.(1). *Chauvin*, 723 N.W.2d at 22. After the defendant was charged, but before his trial, the U.S. Supreme Court decided *Blakeley v. Washington*, 542 U.S. 96 (2004), which rendered unconstitutional the provisions of the Minnesota Sentencing Guidelines that allowed for judicial fact-finding of aggravating sentencing factors. *See Chauvin*, 723 N.W.2d at 22. In an effort to comply with the rule announced in *Blakely*, the district court empaneled a *Blakely* jury after the jury had found the defendant guilty. *Id.* at 23. Based on the *Blakely* jury's findings of fact, the district court imposed an upward durational sentencing departure. *Id.*

On appeal, the defendant in *Chauvin* challenged the district court's authority to empanel a *Blakely* jury. We concluded that the district court was permitted to empanel a sentencing jury because courts have the inherent judicial authority to engage in activities that are necessary to the performance of judicial functions and the exercise of that authority in the context presented in *Chauvin* "did not infringe on" legislative or executive functions. *Chauvin*, 723 N.W.2d at 25-27. We explained that it was "practically necessary" for the district court to improvise a jury fact-finding mechanism because the new rule of criminal procedure announced in *Blakely* left the district court without a constitutional statutory mechanism to impose the aggravated sentence that the Legislature intended. *Id.* at 25. Put differently, the district court could either "completely

31

ignore the legislative scheme for departing from the presumptive guideline sentence," or "it could do the least amount of damage to the statutory scheme by retaining the departure mechanism while at the same time complying with *Blakely* by using a sentencing jury." *Id.*

We said the district court was right to choose the second option. We also explained that impaneling a *Blakely* jury was a uniquely judicial function because it was a procedural matter. *Id.* We emphasized that "*Blakely* did not remove the ability of a judge to impose an aggravated sentence, it only changed the process by which aggravated sentences may be imposed." *Id.* Finally, we explained that the district court had not infringed on the legislative function of creating a sentencing guideline system because "there was no new legislation providing for the same or a different procedure" and "[f]ar from infringing on a legislative function, the district court was effectuating the legislative policy of allowing the opportunity to depart from the presumptive sentence where 'substantial and compelling circumstances exist.' " *Id.* at 27 (quoting Minn. Sent. Guidelines I.4, II.D.) Consequently, we held in *Chauvin* that when a sentencing scheme set out by the Legislature has been ruled unconstitutional and the Legislature has remained silent on how to fix it, district courts have inherent power to adopt judicial procedures that can bring the sentencing scheme into compliance with the new rule of constitutional criminal procedure while doing "the least amount of damage to the statutory scheme." *Id.* at 25.

Unlike *Chauvin*, *Fedziuk*, 696 N.W.2d 340, did not involve a sentencing scheme that failed to comply with a new rule of constitutional criminal procedure.[18] Instead, *Fedziuk* involved two certified questions relating to several amendments to the implied consent law. 696 N.W.2d at 342. We held in *Fedziuk* that the implied consent law, as amended in 2003, offended a driver's constitutional right to procedural due process because the administrative review procedures provided by the executive branch, "although prompt, [did] not provide a sufficiently meaningful review." *Fedziuk*, 696 N.W.2d at 347. We went on to explain that when a statute is unconstitutional, it is "not a law and it is as inoperative as if it had never been enacted." *Id.* at 349. Nevertheless, "only the latest amendment is severed and any previous version found constitutional remains in full force and effect," because an unconstitutional law, "being void and inoperative, cannot repeal or in any way affect an existing one." *Id.* We then

---

[18]    In addition to *Fedziuk*, the dissent of Justice Page cites a number of cases that purportedly support the application of the statutory-revival rule in this case, including *Deegan v. State*, 711 N.W.2d 89, 98 (Minn. 2006), *State v. One Oldsmobile Two-Door Sedan, Model 1946*, 227 Minn. 280, 288, 35 N.W.2d 525, 530 (1948), and *State v. Luscher*, 157 Minn. 192, 195, 195 N.W. 914, 916 (1923). *Infra* at C/D-5 n.3. The dissent's reliance on these cases is misplaced because none of the cases involved a new rule of constitutional criminal procedure or a statutory amendment that was constitutional in some of its applications. Instead, the cases involved claims that the statutory amendment was unconstitutional in all applications. *See Deegan*, 711 N.W.2d at 98 (striking down an amendment that allowed the public defender to decline representation of an indigent defendant who pleaded guilty and received less than the presumptive sentence); *One Oldsmobile Two-Door Sedan*, 227 Minn. at 284-85, 35 N.W.2d at 528 (assuming without deciding that the amendment was unconstitutional due to variances between the enrolled bill approved by the governor and the bill actually passed by the Legislature); *Luscher*, 157 Minn. at 195, 195 N.W. at 916 (striking down an amendment that exempted practicing dentists from newly enacted prohibitions against false advertising and fee splitting).

revived the version of the statute that was in effect immediately prior to the unconstitutional amendments. *Id.*

The remedy we sanctioned in *Chauvin* provides a better fit for the circumstances presented here than the remedy we used in *Fedziuk*.[19] As in *Chauvin*, we are faced with a sentencing scheme that does not comply with the new rule of constitutional criminal procedure announced in *Miller* and the Legislature has remained silent on how to fix it. Consequently, we have two options. We could completely ignore the existing legislative sentencing scheme, which reflects a policy judgment that first-degree premeditated murder warrants a sentence of LWOR. *See* Minn. Stat. § 609.106, subd. 2. In the alternative, we could "do the least amount of damage to the statutory scheme" by remanding to the district court for resentencing following a *Miller* hearing at which the

---

[19] *Fedziuk*, on the other hand, does not provide a workable framework. In *Fedziuk*, we held that the implied consent law was facially unconstitutional. *See* 696 N.W.2d at 342. We then revived—in its entirety—the most recent previous version of the statute that would pass constitutional muster. *See id.* at 342, 349. Here, however, the statute is not facially unconstitutional; in fact, it is constitutional with respect to almost all of those to whom it applies—adults. The statutory mandate is unconstitutional only as applied to juveniles. Because the 2005 amendment to the heinous-crimes statute, Minn. Stat. § 609.106, is not unconstitutional on its face, a *Fedziuk* solution sweeps too broadly and undermines the legislative policy expressed in section 609.106. Citing a Florida Court of Appeals case the dissent of Justice Page argues, "Nothing prevents the court from reviving the 2004 statute only to the extent it applies to juvenile offenders." *Infra* at C/D-7 (citing *Horsley v. State*, 121 So. 3d. 1130, 1132 (Fla. Dist. Ct. App. 2013), *rev. granted* (Fla. Nov. 14, 2013)). The dissent's argument is unpersuasive because even the Florida Court of Appeals is divided as to how to respond to *Miller*. *Compare* the Florida Court of Appeals fifth district's decision in *Horsley*, 121 So. 3d at 1132 (adopting a statutory-revival approach), *with* the fourth district's decision in *Dawson v. State*, 142 So. 3d 948, 949 (Fla. Dist. Ct. App. 2014) (rejecting a statutory-revival argument and remanding for a *Miller* sentencing hearing), the third district's decision in *Hernandez v. State*, 117 So. 3d 778, 783-84 (Fla. Dist. Ct. App. 2013) (same), *and* the first district's decision in *Washington v. State*, 103 So. 3d 917, 920 (Fla. Dist. Ct. App. 2012) (same).

court would consider among other factors, Mahdi's age and his family and home environment. We conclude as we did in *Chauvin* that the second option is the most sensible choice. Assessing what, if any, impact a defendant's age and family environment should have on the sentence in a particular case is a uniquely judicial function. *State v. Misquadace*, 644 N.W.2d 65, 68 (Minn. 2002) (the imposition of a sentence within the limits prescribed by the Legislature is purely a judicial function); *State v. Heywood*, 338 N.W.2d 243, 244 (Minn. 1983) (explaining that a defendant's age and family support are relevant sentencing factors). And remanding for a *Miller* hearing will not infringe on the Legislature's unique power to define the punishment for crimes because there is no legislation post-*Miller* providing for the same or a different procedure.[20] In fact, allowing the district court to hold a *Miller* hearing will "effectuat[e] the legislative policy" to the extent the heinous-crimes statute reflects a legislative preference for LWOR sentences for heinous crimes. *Chauvin*, 723 N.W.2d at 27. This is so because in the absence of mitigating circumstances, the Legislature's prescribed sentence of life without the possibility of release remains unaltered. We, therefore,

---

[20] The dissents contend that the approach we follow here is inconsistent with *Axelberg v. Commissioner of Public Safety*, 848 N.W.2d 206 (Minn. 2014). We disagree. In *Axelberg*, we addressed and deferred to the Legislature's expression of public policy in a "complete system of law" on the topic of administrative license revocation for impaired drivers. *Id.* at 211 (citation omitted) (internal quotation marks omitted). In this case, by contrast, the Legislature has not yet expressed its policy preference in light of the new rule *Miller* pronounced. As we recognized in *Chauvin*, the judiciary's action in fashioning a sentencing procedure when the Legislature has not yet acted in response to a new rule does not run afoul of the separation of powers concerns we are to consider when exercising inherent authority. 723 N.W.2d at 27.

remand to the district court with instructions to vacate the LWOR sentence and then resentence Mahdi on the first-degree premeditated murder conviction following a *Miller* hearing.[21]

B.

Because we are remanding for a *Miller* hearing, we turn now to a discussion of some of the parameters for such a hearing for Mahdi and any other juveniles who are sentenced before the Legislature addresses *Miller*'s impact on the sentencing scheme in the heinous-crimes statute. In *Miller*, the Court held that "a judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles." ___ U.S. at ___, 132 S. Ct. at 2475. The *Miller* Court suggested that mitigating circumstances might include, but are not limited to, the defendant's "chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. . . . the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. . . . [and] the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him." *Miller*, ___ U.S. at ___, 132 S. Ct. at 2468. These factors, while not exclusive, establish a useful starting point.

---

[21] Because only the mandatory imposition of a LWOR sentence for Mahdi's first-degree premeditated murder conviction is unconstitutional, the district court need not reconsider the sentences imposed for the first-degree felony murders of Mohamed Warfa and Anwar Mohammed.

36

In addition, the purpose of a *Miller* hearing is to provide the sentencer an opportunity to consider any mitigating circumstances that would demonstrate that the imposition of a sentence of LWOR is not appropriate. To that end, the district court should, upon request and with the assistance of counsel, hold an evidentiary hearing at which the juvenile may present evidence to establish the existence of any mitigating circumstances.

If on remand the district court here concludes that the circumstances established at Mahdi's *Miller* hearing do not warrant a possibility of release, the court should reimpose a sentence of LWOR in accordance with Minn. Stat. § 609.106. If, on the other hand, the court concludes that the circumstances established at the *Miller* hearing warrant a possibility of release, the court should impose a sentence of imprisonment for life in accordance with Minn. Stat. § 609.185(a), in which case Mahdi will be eligible to seek supervised release under Minn. Stat. § 244.05 after he serves a minimum term of 30 years.

IV.

We turn next to Mahdi's argument that he should be resentenced because his entire sentence violates the Eighth Amendment to the U.S. Constitution and Article I, Section 5 of the Minnesota Constitution. Mahdi argues that because his consecutive sentences are the "practical equivalent" of LWOR, the aggregate sentence is

37

unconstitutional. Whether a criminal sentence violates the constitution is a question of law that we review de novo. *State v. Gutierrez*, 667 N.W.2d 426, 438 (Minn. 2003).[22]

A.

Mahdi argues that although *Miller* did not address the imposition of lengthy aggregate sentences, the district court's decision to impose consecutive life sentences was the equivalent of imposing a sentence that "from the outset denied [him] the possibility of ever being released from prison."[23] Therefore, he argues, the "entire sentence was the practical equivalent of the type of sentence that *Miller* held violated the Eighth Amendment[.]" The State, however, contends that *Miller* does not address the imposition of discretionary consecutive sentences, and that the district court had an opportunity to consider mitigating circumstances before imposing Mahdi's sentence. We agree with the State.

---

[22] The State first argues that Mahdi forfeited this argument by not raising it below. We disagree. Ordinarily, we will not decide issues that were not raised before the district court, even when criminal defendants raise constitutional claims for the first time on appeal. *See State v. Busse*, 644 N.W.2d 79, 89 (Minn. 2002). But in *State v. Osborne*, we concluded that the defendant did not forfeit consideration of his *Blakely* claim by failing to raise it in the district court because the *Blakely* rule was announced after his sentencing hearing. 715 N.W.2d 436, 442 (Minn. 2006). Like the defendant in *Osborne,* we conclude that Mahdi did not forfeit consideration of his *Miller* claim by failing to raise it in the district court because the *Miller* rule was announced after Mahdi's sentencing hearing.

[23] Because we have vacated Mahdi's LWOR sentence and remanded for resentencing, we consider only the constitutionality of the consecutive imposition of the two sentences mandating life with the possibility of release after 30 years for the first-degree felony murders of Mohamed Warfa and Anwar Mohammed, under Minn. Stat. §§ 609.185(a)(3), 244.05, subd. 4(b).

Mahdi's argument fails to recognize that the *mandatory* imposition of an LWOR sentence was the crucial factor in *Miller*. *Miller*, ___ U.S. at ___, 132 S. Ct. at 2466. In *Miller*, the Court said that the fact that the sentences are mandatory "prevent[s] the sentencer from taking account of these central considerations." *Id.* Removing youth from the balance prohibits a sentencing authority "from assessing whether the law's harshest term of imprisonment proportionately punishes a juvenile offender." *Id.* at ___, 132 S. Ct. at 2466. The Court specifically did not foreclose the punishment of LWOR for juveniles, but required that such sentences not be imposed without taking the defendants' youth into consideration. *Id.* at ___, 132 S. Ct. at 2469 ("Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.").

The decision to impose concurrent or consecutive sentences falls within the discretion of the district court. Minn. Stat. § 609.15 (2012); s*ee State v. Warren*, 592 N.W.2d 440, 451 (Minn. 1999) ("Sentencing is within the discretion of the trial court absent an abuse of discretion."); Minn. Sent. Guidelines 2.F.2.a.(1)(ii) (providing that it is permissible for district court judges to sentence those convicted of first-degree murder to consecutive sentences). In Mahdi's case, the district court exercised its discretion to sentence Mahdi to consecutive life sentences, after considering all the aggravating and mitigating circumstances specific to his crimes. Because the imposition of consecutive sentences was not mandatory, but was discretionary, Mahdi's reliance on *Miller* is misplaced. We therefore hold that the district court's imposition of consecutive

39

sentences for the two first-degree felony murder convictions is not cruel and unusual punishment under the U.S. Constitution.

B.

Mahdi also argues that the imposition of consecutive life sentences violates Article I, Section 5 of the Minnesota Constitution. We disagree.

The Minnesota Constitution contains a provision that is almost identical to the Eighth Amendment, but it prohibits "cruel *or* unusual" punishments instead of "cruel *and* unusual" punishments. *Compare* Minn. Const. art. I, § 5 (emphasis added), *with* U.S. Const. amend. VIII (emphasis added). We have held that this difference in wording is "not trivial" because the " 'United States Supreme Court has upheld punishments that, although they may be cruel, are not unusual.' " *State v. Vang*, 847 N.W.2d 248, 263 (Minn. 2014) (quoting *State v. Mitchell*, 577 N.W.2d 481, 488 (Minn. 1998)). In determining whether a particular sentence is cruel or unusual under the Minnesota Constitution, courts should separately examine whether the sentence is cruel and whether it is unusual. *State v. Juarez*, 837 N.W.2d 473, 482 (Minn. 2013). Someone challenging a sentence as cruel or unusual bears the "heavy burden . . . of showing that our culture and laws emphatically and well nigh universally reject the sentence." *State v. Chambers*, 589 N.W.2d 466, 479 (Minn. 1999) (citation omitted) (internal quotation marks omitted).

To determine whether a sentence is cruel, a court should compare the gravity of the offense to the severity of the sentence. *See Mitchell*, 577 N.W.2d at 489 (noting that this step of the analysis is consistent with the first step of the case-by-case analysis for the Eighth Amendment). Mahdi has made no showing that the imposition of consecutive

40

sentences was disproportionate considering the gravity of the offenses the jury found that he committed. Therefore, Mahdi has not shown that the sentence is "cruel" under Article I, Section 5 of the Minnesota Constitution.

To determine whether a sentence is unusual, a court should compare the defendant's sentence with sentences received by other offenders convicted of the same or similar offenses both inside and outside of Minnesota. *See Juarez*, 837 N.W.2d at 482. Here, too, Mahdi's claim fails. We have repeatedly affirmed consecutive life sentences for juveniles for the kinds of crimes that Mahdi committed. *See, e.g.*, *State v. Flowers*, 788 N.W.2d 120, 122 (Minn. 2010) (affirming two consecutive life sentences for a 16-year-old who murdered two people while trying to rob a house); *State v. Warren*, 592 N.W.2d 440, 452 (Minn. 1999) (holding that a district court abused its discretion in imposing concurrent sentences on a defendant who shot and killed three victims); *State v. Ouk*, 516 N.W.2d 180, 186 (Minn. 1994) (affirming consecutive sentences for a 15-year-old who shot and killed two people at close range); *State v. Brom*, 463 N.W.2d 758, 765 (Minn. 1990) (affirming consecutive life sentences for a 16-year-old who murdered his parents and siblings with an ax). Mahdi has also made no showing that such sentences are "unusual" in other states. Therefore, we hold that the district court's imposition of consecutive life sentences did not violate Article I, Section 5 of the Minnesota Constitution.

C.

Mahdi next argues that the district court abused its discretion in imposing consecutive sentences. First, he argues that the court failed to recognize that "juveniles

41

differ from adults for sentencing purposes and are less deserving of the harshest punishments because they have diminished culpability and heightened prospects for reform." Second, he argues that the district court abused its discretion because it imposed consecutive sentences with the express purpose of preventing Mahdi from ever being released from prison. The State, on the other hand, argues that the court's discretionary imposition of consecutive life sentences for Mahdi's convictions for multiple murders is not excessive, noting that Mahdi's case is one of those "uncommon or rare crimes for which the most severe punishment should be reserved."

A district court's decision to impose consecutive sentences is reviewed for an abuse of discretion. *State v. McLaughlin*, 725 N.W.2d 703, 715 (Minn. 2007). We will interfere with a district court's sentencing discretion only when the sentence is disproportionate to the offense or it unfairly exaggerates the criminality of the defendant's conduct. *State v. Fardan*, 773 N.W.2d 303, 322 (Minn. 2009). In cases with multiple victims, consecutive sentences are rarely, if ever, disproportionate to the offense. In *McLaughlin*, for example, we upheld the imposition of two consecutive life sentences for a student who shot and killed two of his classmates when he was 15. 725 N.W.2d at 715-16. McLaughlin argued that the district court abused its discretion by imposing consecutive sentences because the court failed to give sufficient weight to several factors related to his culpability, including his youth. *Id.* at 715. In rejecting his challenge, we noted that "youth" was a factor in numerous cases in which we had upheld comparable sentencing, especially those involving "particularly callous murders." *Id.* at 716; *see also Warren*, 592 N.W.2d at 452 (holding that a district court abused its discretion in

42

imposing concurrent sentences on a defendant for three murders); *Ouk*, 516 N.W.2d at 186 (affirming consecutive sentences for a 15-year-old who shot and killed two people at close range); *Brom*, 463 N.W.2d at 765 (affirming consecutive life sentences for a 16-year-old who murdered his parents and siblings with an ax).

Like the defendants in *McLaughlin*, *Ouk*, *Brom*, and *Warren*, Mahdi is convicted of "particularly callous murders." *See McLaughlin*, 725 N.W.2d at 716. The defense acknowledges that because of the age-determination hearing, the district court "had an abundance of information about appellant's unique personal circumstances," and the defense also urged the court at sentencing to consider Mahdi's youthful characteristics. Nonetheless, the court recognized the singular brutality with which Mahdi carried out the crimes and made clear that Mahdi should never be released from prison. *See Warren*, 592 N.W.2d at 452 (noting that the district court should have considered "severe aggravating factors" when determining whether the sentence should be consecutive or concurrent). We hold that the district court did not abuse its discretion by imposing consecutive sentences on Mahdi.

V.

Mahdi also raises a series of pro se arguments in a supplemental brief. We consider each of them in turn.

Mahdi first argues that he received ineffective assistance of counsel. Specifically, he argues that his attorney should have requested a change of venue and that he should have introduced evidence of an alternative perpetrator. These claims fail because they raise matters of trial strategy, which we will not review. *Leake v. State*, 737 N.W.2d 531,

536 (Minn. 2007). Moreover, even if these two matters did not constitute trial strategy, Mahdi has not shown that his counsel's decision on these two matters was objectively unreasonable. *State v. Lahue*, 585 N.W.2d 785, 789 (Minn. 1998) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)) (noting that to prevail on an ineffective assistance of counsel claim, an appellant must show that trial counsel's representation "fell below an objective standard of reasonableness, and that a reasonable probability exists that the outcome would have been different but for counsel's errors").

Mahdi separately argues that his counsel was ineffective because he did not challenge the prosecutor's claims of finding blood on Mahdi's pants and did not maintain Mahdi's innocence during the opening and closing statements. These claims fail for lack of factual support.

Based on our careful review of the record, we hold that Mahdi has not shown that his counsel was ineffective.[24]

Mahdi also argues that his *Miranda* waiver was not knowing, voluntary and intelligent. *See Miranda v. Arizona*, 384 U.S. 436 (1966). But we will not decide issues that were not raised before the district court, even when criminal defendants raise constitutional claims for the first time on appeal. *See State v. Busse*, 644 N.W.2d 79, 89 (Minn. 2002). Mahdi did not argue below that his *Miranda* waiver was insufficient, and therefore the record has not been sufficiently developed for the court to consider this

---

[24] Mahdi also argues that the prosecutor committed misconduct, that the DNA experts made mistakes, and that the district court judge was "unfair." We do not consider these arguments because they are simply argumentative assertions without any factual or legal support. *See State v. Coe*, 290 Minn. 537, 538, 188 N.W.2d 421, 422 (1971).

44

claim.  *See Johnson v. State*, 673 N.W.2d 144, 147 (Minn. 2004) ("One purpose of this rule is to encourage the development of a factual basis for claims at the district court level.").

Mahdi next alleges that because he was a juvenile at the time of the crime, he was entitled to a certification hearing before being tried as an adult.  Because the district court found by a preponderance of the evidence that Mahdi was 16 at the time of the murders, he is not entitled to a certification hearing.  Minn. Stat. §§ 260B.007, subd. 6(b), 260B.101, subd. 2 (2012).  Accordingly, this claim is without merit.

Finally, Mahdi alleges that a juror committed misconduct.  Specifically, Mahdi alleges that the juror committed misconduct by telling a family member of one of the victims where the courthouse restrooms were during the trial, and then not telling the district court about the incident when she was asked.  Mahdi hired a private investigator who spoke with the juror after the trial.  In an affidavit, the investigator says that the juror told him she was "approaching the jurors' door to the courtroom when an older woman wearing a hijab and appearing to be of Somali descent approached her and spoke with her briefly."  The juror then told the investigator that, "she didn't tell the Judge about the woman approaching and speaking to her because [she] didn't feel it was important to tell the Judge."

Mahdi's claim fails for several reasons.  First, the affidavit is not part of the district court record and so we do not consider it.  *See State v. Manley*, 664 N.W.2d 275, 286 (Minn. 2003).  Second, even if the affidavit was part of the record, it does not establish that the juror committed any misconduct.  Her statements to the district court

45

and the statements attributed to her in the affidavit are not inconsistent.  The court was clearly concerned about any improper contact and asked the juror whether anybody present for the trial had talked to her.  The court specifically asked the juror about spectators in the courtroom and witnesses in the trial, and about whether someone spoke to her about the case.  Even if a Somali woman approached the juror and asked where the bathroom was, as asserted in the affidavit, there is no evidence that this woman was in any way associated with the trial or related to a victim.  Therefore, Mahdi's claim fails.

Affirmed in part, reversed in part, and remanded.

## CONCURRENCE & DISSENT

PAGE, Justice (concurring in part, dissenting in part).

The court remands Mahdi's case for a hearing to comply with the requirements of *Miller v. Alabama*, ___ U.S. ___, 132 S. Ct. 2455 (2012), for the judge or a jury to consider whether a life sentence with the possibility of release after 30 years is a more appropriate sentence than the mandatory life sentence without the possibility of release (LWOR), which he is now serving. The case law on which the court relies to justify its decision is inapposite. In my view, the appropriate remedy is to sever the heinous-crimes statute as it relates to juveniles and revive the most recent constitutionally valid versions of Minn. Stat. §§ 244.05, subd. 4(b), 609.106, subd. 2(1), and 609.185 (2012) for juvenile offenders only, and then remand to the district court for imposition of a life sentence with the possibility of release after 30 years. The previous versions of these statutes did not provide for a departure mechanism for the district court to consider whether, despite the defendant's youth, an LWOR sentence was more appropriate. *See* Minn. Stat. §§ 244.05, subd. 4, 609.106, subd. 2(1), and 609.185 (2004). Reviving these statutes is the appropriate remedy because, as an issue of substantive law, fixing the sentence to be imposed for first-degree premeditated murder is a legislative function. Under the separation of powers, *see* Minn. Const. art. III, § 1, our court lacks the authority to remand Mahdi's case for a hearing to consider whether a life sentence with the possibility of release after 30 years is more appropriate than an LWOR sentence. The court's decision to modify the unconstitutional sentencing scheme now in place and replace it

with a judicially created scheme usurps the Legislature's authority to amend its own statutes. For that reason, I respectfully dissent from part III of the court's decision.

I.

The court is correct that Mahdi's LWOR sentence is unconstitutional under *Miller*, ___ U.S. at ___, 132 S. Ct. at 2460. The court attempts to remedy this constitutional violation by remanding to the district court for a hearing to determine whether LWOR or life imprisonment with the possibility of release after 30 years is the appropriate sentence. The court contends that *State v. Chauvin* supports its conclusion that we have the power to fashion such a sentencing hearing. 723 N.W.2d 20 (Minn. 2006). But in *Chauvin* we considered only whether the district court had the authority to impanel a sentencing jury, not whether we had authority to amend a statute setting forth the punishment for a criminal offense. *Id.* at 22 (determining that a district court could empanel a sentencing jury under *Blakely* to comply with the Minnesota Sentencing Guidelines). We said that "impaneling a sentencing jury did not change the punishment available for the underlying substantive offense. It merely changed the steps that the court took in arriving at a sentence already authorized by the legislature." *Id.* at 25. Accordingly, we held that the district court had the authority to impanel a sentencing jury. *Id.* at 27. In contrast, here the court "change[s] the punishment available for the underlying substantive offense," *id.* at 25, by judicially amending the sentencing statute to give the district court two options in sentencing Mahdi: LWOR or life with the possibility of release after 30 years. But the sentencing statutes enacted by the Legislature include only one option: LWOR. *See* Minn. Stat. § 609.106, subd. 2(1) (2012) ("The court *shall* sentence a person to [LWOR]

C/D-2

[if] the person is convicted of first-degree [premeditated] murder[.]" (emphasis added)).

Therefore, this case does not fall within the rule established in *Chauvin*.[1]

The court also contends that, as in *Chauvin*, "allowing the district court to hold a *Miller* hearing will 'effectuat[e] the legislative policy' to the extent the heinous-crimes statute reflects a legislative preference for LWOR sentences for heinous crimes." This statement assumes that the Legislature's only policy consideration in mandating LWOR sentences for all offenders was its desire to impose the harshest sentence available on those convicted of first-degree premeditated murder. But there is reason to believe that the Legislature's policy preferences are more nuanced than the court hypothesizes.[2] It

---

[1]    Indeed, the present case is more similar to our decisions in *State v. Shattuck*, 704 N.W.2d 131 (Minn. 2005), and *State v. Barker*, 705 N.W.2d 768 (Minn. 2005), two cases decided post-*Blakely* involving an unconstitutional statute that allowed the judge, rather than the jury, to make findings of fact supporting aggravated sentences. In both of those cases, the district court had not convened a sentencing jury before imposing aggravated sentences, *Barker*, 705 N.W.2d at 770-71; *Shattuck*, 704 N.W.2d at 134-35, and in each case, the State asked us to remand to the district court with instructions to convene a sentencing jury  to determine whether the aggravating sentencing factors existed. *Barker*, 705 N.W.2d at 775-76; *Shattuck*, 704 N.W.2d at 147-48. We declined, reasoning that "engaft[ing] sentencing-jury . . . requirements onto the Sentencing Guidelines and sentencing statutes would require rewriting them, something our severance jurisprudence does not permit." *Shattuck*, 704 N.W.2d at 148; *accord Barker*, 705 N.W.2d at 775-76. Instead, we "left to the legislature the task of amending the Minnesota sentencing scheme to comport with the requirements of *Blakely* . . . ." *Barker*, 705 N.W.2d at 775; *see Shattuck*, 704 N.W.2d at 147-48.

[2]    For example, this year the Legislature considered several bills that would have made Minnesota's sentencing of juvenile homicide offenders consistent with *Miller*. Several of these bills would have favored sentencing consistency over longer sentences by mandating that juveniles convicted of first-degree premeditated murder be eligible for release after 20 years, H.F. 3061, Art. 6, § 1, 88th Minn. Leg. 2014; S.F. 2273, Art. 4, § 1, 88th Minn. Leg. 2014. Other bills would have favored longer sentences by allowing the district court to impose LWOR sentences on juvenile homicide offenders if, after a

(Footnote continued on next page.)

C/D-3

may be that the Legislature's policy preferences had as much to do with ensuring sentencing consistency as imposing the harshest sentence available. *See* Minn. Sent. Guidelines 1.A. ("The purpose of the Sentencing Guidelines is to establish rational and consistent sentencing standards that reduce sentencing disparity . . . ."). And although the court's decision advances the policy of imposing the harshest sentence available, it frustrates the policy of facilitating consistency in sentencing. In any event, it is for the Legislature, not this court, to weigh these competing policy interests and to decide the appropriate sentence, knowing that a mandatory LWOR sentence cannot be imposed on juveniles.

In my view, severing that part of the heinous-crimes statute that is unconstitutional and utilizing the statutory-revival remedy we applied in *Fedziuk v. Commissioner of Public Safety*, not the remedy we applied in *Chauvin*, is the appropriate vehicle to remedy Mahdi's unconstitutional sentence. 696 N.W.2d 340 (Minn. 2005). In accordance with *Fedziuk*, I conclude that the court should remand Mahdi's case to the district court with instructions to apply the most recent constitutionally valid sentencing statute to Mahdi's first-degree premeditated murder conviction. This remedy is preferable to the court's

---

(Footnote continued from previous page.)
sentencing hearing, the court concludes that an LWOR sentence is appropriate in light of the defendant's culpability and youth. S.F. 982, § 3, 88th Minn. Leg. 2014; H.F. 2540, § 3, 88th Minn. Leg. 2014; H.F. 1217, § 3, 88th Minn. Leg. 2014. There is nothing in the record before us, other than the unconstitutional statute itself, giving us any indication as to what the legislative policy priorities may have been when the 2005 amendments were enacted.

because it ensures the district court will impose a legislatively authorized sentence and allows us to avoid speculating about the Legislature's policy preferences.

In *Fedziuk*, the respondent argued that the 2003 amendments to Minnesota's Implied Consent Law violated her due process rights because they removed the requirement for prompt judicial review of a prehearing revocation. *Id.* at 342. We agreed and considered the appropriate remedy for the constitutional violation. *Id.* at 349. The district court had revived the 1980 version of the law to remedy the due process problem. *Id.* The 1980 version of the law provided for no pre-hearing license revocation. *Id.* The Commissioner argued that the district court should have severed only the 2003 amendments and revived the most recent constitutional version of the law. On appeal, we observed that "[w]hen a statute is unconstitutional, it is not a law and it is as inoperative as if it had never been enacted." *Id.* We noted that an unconstitutional law, being void, cannot repeal an existing law. *Id.* Only the latest amendment is severed, however, and any previous constitutional version remains in effect. *Id.* Accordingly, we revived the version of the Implied Consent Law that existed immediately before the unconstitutional 2003 amendments. *Id.*[3]

---

[3] We have applied the statutory-revival rule in other cases as well. *See, e.g.*, *Deegan v. State*, 711 N.W.2d 89, 98 (Minn. 2006) (reviving an older version of a statute because the amended statute violated defendants' right to the assistance of counsel); *State v. One Oldsmobile Two-Door Sedan, Model 1946*, 227 Minn. 280, 288, 35 N.W.2d 525, 530 (1948) ("An unconstitutional statute, being void and inoperative, cannot repeal or in any way affect an existing one."); *State v. Luscher*, 157 Minn. 192, 195, 195 N.W. 914, 916 (1923) ("The statute being void is inoperative for any purpose and made no change in the existing law."); *see also Frost v. Corp. Comm'n of Okla.*, 278 U.S. 515, 527-28 (1929) (reviving previous version of a statute when amendment was unconstitutional).

Applying these principles to this case, I conclude that the appropriate remedy is to revive the 2004 version of the statute. *See* Minn. Stat. § 244.05, subd. 4 (2004) (providing that an inmate serving a mandatory life sentence for first-degree premeditated murder is eligible for supervised release after serving 30 years). Under *Miller*, the heinous-crimes statute is categorically unconstitutional as to juvenile homicide offenders. ___ U.S. ___, 132 S. Ct. 2455, 2460 (2012). Therefore, under *Fedziuk*, the Legislature's 2005 attempt to amend this statute to require juvenile defendants convicted of first-degree premeditated murder to serve an LWOR sentence was ineffective and "as inoperative as if it had never been enacted" with respect to them. *See* Act of June 2, 2005, ch. 136, art. 2, §§ 3-5, 2005 Minn. Laws 901, 922 (codified at Minn. Stat. §§ 244.05, subd. 5, 609.106, subd. 2(1) (2012)); *Miller*, ___ U.S. at ___, 132 S. Ct. at 2460; *Fedziuk*, 696 N.W.2d at 349. Consequently, Minn. Stat. § 244.05, subd. 4 (2004), was, in effect, never repealed with respect to juveniles and provides a legislatively mandated sentence of life imprisonment with the possibility of release after 30 years for juvenile offenders convicted of first-degree premeditated murder. *See Fedziuk*, 696 N.W.2d at 349; *see also Horsley v. State*, 121 So. 3d 1130, 1132 (Fla. Dist. Ct. App. 2013) (reviving previous version of a sentencing statute because the current version of a statute was unconstitutional under *Miller*), *rev. granted* (Fla. Nov. 14, 2013); *Rodriguez-Giudicelli v. State*, 143 So. 3d 947, 948 (Fla. Dist. Ct. App. 2014) (same). Minnesota Statutes § 244.05, subd. 4 (2004), did not permit the district court to consider whether, notwithstanding the defendant's youth, a LWOR was more appropriate. In contrast to the court's application of *Chauvin*, statutory revival does not require the court to create a

sentence not authorized by the Legislature. Instead, by reviving the previous version of the statute, we simply return to a sentence previously authorized by the Legislature. *See Horsley*, 121 So. 3d at 1132 ("The advantage of relying upon the doctrine of statutory revival is that we simply revert to a solution that was duly adopted by the legislature itself . . . ."). Similarly, the court would not have to speculate about what the Legislature's policy preferences might be if it simply revived the most recent constitutionally valid version of the heinous-crimes statute. *See id.* ("[T]he doctrine of statutory revival . . . avoid[s] the type of 'legislating from the bench' that would be required if we were to essentially rewrite the existing statute with original language which we feel might better meet the policy goals of the current legislature.").

The court argues that "[b]ecause the 2005 amendment to the heinous-crimes statute, Minn. Stat. § 609.106, is not unconstitutional on its face, a *Fedziuk* solution sweeps too broadly and undermines the legislative policy expressed in section 609.106." Practically speaking, it is hard to see how imposing a sentence under the previous version of the statute is "unworkable," particularly when, under the court's own remedy, the same sentence remains a possibility. Moreover, as noted above, the heinous-crimes statute *is* facially unconstitutional as to the entire category of juvenile offenders. *See Miller*, ___ U.S. at ___, 132 S. Ct. at 2469, 2473 n.13. Nothing prevents the court from reviving the 2004 statute only to the extent it applies to juvenile offenders. *See Horsley*, 121 So. 3d at 1132 (reviving previous version of a sentencing statute to hold that the only sentence available for a juvenile convicted of capital murder is life imprisonment with the

possibility of release after 25 years). Therefore, applying *Fedziuk* is practically workable, and doctrinally required.[4]

By remanding for a hearing and giving the district court the option of imposing a sentence of life imprisonment with the possibility of release after 30 years, the court abandons our longstanding practice of strictly adhering to the limits imposed by statutory text. The court recently reaffirmed our strict adherence to statutory limitations in its decision in *Axelberg v. Commissioner of Public Safety*, 848 N.W.2d 206 (Minn. 2014). In that case, Axelberg drove under the influence of alcohol in order to escape serious bodily injury at the hands of her abusive husband. *Id.* at 207. The Commissioner of Public Safety revoked Axelberg's driver's license. *Id.* Axelberg sought judicial review. *Id.* At the implied consent hearing, Axelberg attempted to assert the affirmative defense of necessity, which allows an individual to escape liability for a wrongful act if the person had to do the act to avoid instant and overwhelming harm. *Id.* at 207 n.2. The

---

[4] The court's chosen remedy is also more complicated than the court realizes. Remand for a hearing will require the sentencer to find facts, and make determinations based on those facts, as to whether a sentence of LWOR should be re-imposed on Mahdi. Arguably, such a hearing would raise concerns under *Blakely* depending on how one reads the court's judicially-amended statute. " 'Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt,' " 542 U.S. at 301 (quoting *Apprendi v. New Jersey,* 530 U.S. 466, 490 (2000)), with "statutory maximum" defined as the "maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*," *id*. at 303. If the statutory maximum of the court's new statute is life with the possibility of release after 30 years, and facts need to be found to impose a sentence of LWOR, then *Blakely* requires those facts to be found by a jury, not the judge. Of course, the applicability of *Blakely* depends on the words of the statute, which is why amendment of the statute must be done by the Legislature, not this court.

statute at issue in *Axelberg*, however, strictly limited the issues one could raise in license revocation hearings and did not include the necessity defense among them. *Id.* at 208 & n.3. Because the necessity defense was not included within this limitation, we concluded that the defense was not available. *Id.* at 208. In so concluding, we noted that "if the Implied Consent Law needs revision in order to make it embody a more sound public policy, the Legislature, not the judiciary, must be the reviser." *Id.* at 213.

The court attempts to distinguish this case from *Axelberg* on the basis that here "the Legislature has not yet expressed its policy preference in light of the new rule *Miller* pronounced." This is precisely the point. In the absence of legislative guidance post-*Miller*, the court's assertion that remand for a hearing will "effectuate the legislative policy" is mere conjecture, without basis in the statutory text. As the court explains in *Axelberg*, it is the prerogative of the Legislature, not the judiciary, to determine what constitutes sound public policy and to make the statutory revisions necessary to reflect that policy determination.

"Those who are bound by our decisions usually believe they can take us at our word. Not so today." *Wheaton Coll. v. Burwell*, ___ U.S. ___, 134 S. Ct. 2806, 2808 (2014) (Sotomayor, J., dissenting). Contrary to the court's rhetoric in *Axelberg*, the court today judicially amends the heinous-crimes statute to allow for a sentence, and sentencing procedure, not permitted by the Legislature.

## II.

> "As sound as the public policy arguments may be, the only way to reach the conclusion that [a *Miller* hearing] is available here is through an act of pure judicial will."

*Axelberg v. Comm'r of Pub. Safety*, 848 N.W.2d 206, 212 (Minn. 2014).

The court contends that our inherent judicial power gives us the authority to remand for a hearing and to permit the district court to impose a life sentence with the possibility of release after 30 years. The court is wrong. Our inherent judicial power only allows us to provide a remedy in the absence of legislative authorization when it is necessary to achieve a unique judicial function. *Shattuck*, 704 N.W.2d at 147-48. The regulation of procedural matters is a unique judicial function. *State v. Johnson*, 514 N.W.2d 551, 554 (Minn. 1994).[5] Matters of substantive law, however, are exclusively within the province of the Legislature. *Id.*

The determination of whether to remand to consider if an LWOR sentence or a life sentence with the possibility of release after 30 years encroaches upon a legislative function, therefore, turns on whether Minnesota's sentencing scheme is a matter of substantive or procedural law. Because our state's sentencing scheme is a matter of substantive law, I conclude that the court lacks the power to authorize a *Miller* hearing.

We have long held that the Legislature has the sole authority to "fix the limits of punishment for criminal acts." *Shattuck*, 704 N.W.2d at 148; *see also State v. Osterloh*,

---

[5] The court is correct that in *Chambers v. State* we concluded that the *Miller* rule is procedural for retroactivity purposes. 831 N.W.2d 311, 328 (Minn. 2013). But that characterization is only relevant to *Miller*'s retroactive application, *id.* at 327-30, not to a court's substantive amendment to the statutory scheme.

275 N.W.2d 578, 580 (Minn. 1978) ("Determination of what conduct constitutes a criminal offense and the punishment that ought to be imposed . . . is peculiarly a legislative and not a judicial function." (citation omitted) (internal quotation marks omitted)); *State v. Moilen*, 140 Minn. 112, 115, 167 N.W. 345, 346 (Minn. 1918) ("It is the exclusive province of the Legislature to declare what acts . . . shall constitute a crime, to prohibit the same and impose appropriate penalties for a violation thereof."). When it enacted the current version of the heinous-crimes statute, the Legislature removed the district court's discretion to impose any sentence other than LWOR. Minn. Stat. § 244.05, subd. 4(a) ("An inmate serving a mandatory life sentence [for first-degree premeditated murder] must not be given supervised release under this section."); Minn. Stat. § 609.106, subd. 2(1) ("The court shall sentence a person to [LWOR] [if] the person is convicted of first-degree [premeditated] murder[.]"). Thus, under the current version of the relevant statutes, the only option the district court has in sentencing Mahdi for his first-degree premeditated murder conviction is LWOR, a sentence that is unconstitutional under *Miller*.

Yet, the court remands this case to the district court for that court to consider whether, in light of Mahdi's youth, an LWOR sentence *or* a life sentence with the possibility of release after 30 years is the appropriate remedy. In so doing, the court, not the Legislature, has "fix[ed] the limits of punishment" available in sentencing Mahdi, in

contravention of the Legislature's authority.[6] *See Shattuck*, 704 N.W.2d at 148; *see also Commonwealth v. Brown*, 1 N.E.3d 259, 264-66 (Mass. 2013) (stating "[i]t is the province of the Legislature to define crimes and set penalties in the first instance" and rejecting the Commonwealth's approach at remedying the unconstitutional sentencing statute in light of *Miller* because "the Commonwealth's approach would have sentencing judges creating an entirely new penalty scheme ad hoc"). Accordingly, this court is without authority to remand to the district court to conduct a hearing. Instead, the appropriate remedy is to sever the unconstitutional provision, revive the 2004 version of Minn. Stat. § 244.05, subd. 4, and sentence Mahdi to life imprisonment with the possibility of release after 30 years. *See* Minn. Stat. § 244.05, subd. 4 (2004).

## III.

In sum, I conclude that, by remanding to the district court to decide after a hearing whether Mahdi should be sentenced to LWOR or life imprisonment with the possibility of release after 30 years, we encroach on the Legislature's responsibility to fix the limits of punishment. Accordingly, I would remand to the district court with instructions to impose a sentence of life imprisonment with the possibility of release after 30 years. *See* Minn. Stat. § 244.05, subd. 4 (2004).

---

[6] Nothing prevents the Legislature from fixing the limits of punishment for juveniles in the same way that the court does today or in some other manner. The Legislature's failure to fix the unconstitutional statute, however, does not give the court the authority to act on the Legislature's behalf. Moreover, the court's decision to modify the unconstitutional sentencing scheme now in place, rather than reviving the most recent constitutional version of the law, removes any incentive for the Legislature to amend the statutory scheme so that it complies with *Miller's* requirements.

STRAS, Justice (concurring in part, dissenting in part).

I agree with many of the points made in Justice Page's dissent, but write separately to explain my disagreement with Part III of the court's opinion. The Legislature has stated in clear and unambiguous terms: "The court *shall* sentence a person to life imprisonment without possibility of release" for a conviction of first-degree premeditated murder. Minn. Stat. § 609.106, subd. 2 (2012). The entire court agrees that the mandatory LWOR sentence prescribed by the Legislature is unconstitutional with respect to juveniles like Mahdi Ali under *Miller v. Alabama*, ___ U.S. ___, 132 S. Ct. 2455, 2460 (2012),[1] but we disagree about the proper remedy.

It is well established that the judiciary does not write statutes; nor do we amend them, no matter the circumstances. *See, e.g.*, *Axelberg v. Comm'r of Pub. Safety*, 848 N.W.2d 206, 213 (Minn. 2014); *Dukowitz v. Hannon Sec. Servs.*, 841 N.W.2d 147, 151-54 (Minn. 2014); *In re Estate of Karger*, 253 Minn. 542, 548, 93 N.W.2d 137, 142 (1958). Instead, our authority is limited to the exercise of "judicial power." Minn. Const.

---

[1]    I agree with the court's conclusion that Ali did not forfeit his constitutional claim under *Miller*. The court correctly relies on *Osborne* in reaching its conclusion, but I am concerned that the court's description of *Osborne* may be incomplete. The key to understanding *Osborne* is that an intervening change in the law had excused the defendant's failure to assert what otherwise would have been a *futile* objection in the district court. *See State v. Osborne*, 715 N.W.2d 436, 442 (Minn. 2006) (noting that we had "consistently rejected any *Blakely*-type claim" and that we could not "expect defendants to continue, formalistically, to make motions or objections based on arguments that we have repeatedly rejected as being without legal merit"). *Osborne* does not broadly excuse the failure of defendants to object whenever there happens to be a change in the law.

art. III; Minn. Const. art. VI, § 1; *Sanborn v. Rice Cnty. Comm'rs*, 9 Minn. (9 Gil.) 273, 278 (1864); *see also State v. M.D.T.*, 831 N.W.2d 276, 284 (Minn. 2013) (Stras, J., concurring) (stating that the power of the judicial branch is limited to exercising the "judicial power"). The court presumes that the "judicial power" includes the authority to establish procedures within the courts—a proposition that finds support in *State v. Chauvin*, 723 N.W.2d 20 (Minn. 2006). Still, *Chauvin* provides, at most, only partial support for the court's preferred remedy. Even if the "judicial power" includes authority to create an ad-hoc hearing procedure to comply with *Miller*, it certainly does not give courts the power to amend the heinous-crimes statute,[2] *see* Minn. Stat. § 609.106, subd. 2, to replace "shall" with "may" so that it now reads, "the court *may* sentence a person to life imprisonment without possibility of release," or, as the court also has done, to provide a list of substantive factors for district courts to consider in determining the appropriate sentence.[3] Amending statutes is, and always has been, the Legislature's job,

---

[2]     The court's conclusion that the remedy in *Chauvin* is similar to the remedy in this case makes an apples-and-oranges comparison. An apple sounds like an orange when it is described as a sweet-tasting fruit that grows on a tree and has seeds. And while it is true that these are shared characteristics of both fruits, the fact remains that an apple is not an orange, and this case is not *Chauvin*. The court is correct when it says that *Chauvin* provides authority for the proposition that a court has the power in certain circumstances to make a procedural decision about which factfinder—the judge or the jury—will make a particular finding, but the court's comparison falls short when it uses *Chauvin* to support its chosen remedy in this case. *Chauvin* simply did not involve a situation in which we were required to change the *Legislature's prescribed sentence* for an offense so that the statute could pass constitutional muster. In concluding otherwise, the court confuses apples and oranges.

[3]     Nowhere in the court's opinion does it actually say *what* its amended heinous-crimes statute says. The court cannot be applying the current statute because it mandates

(Footnote continued on next page.)

particularly when it involves defining criminal offenses and establishing criminal sentences. *See State v. Osterloh*, 275 N.W.2d 578, 580 (Minn. 1978) ("Determination of what conduct constitutes a criminal offense and the punishment that ought to be imposed . . . is peculiarly a legislative and not a judicial function." (quoting *State ex rel. Ahern v. Young*, 273 Minn. 240, 243, 141 N.W.2d 15, 17 (1966))); *State v. Moilen*, 140 Minn. 112, 115, 167 N.W. 345, 346 (1918) ("It is the exclusive province of the Legislature to declare what acts . . . constitute a crime, to prohibit the same and impose appropriate penalties for a violation thereof.").

Squarely within the scope of "judicial power," however, is the power to sever an unconstitutional provision and enforce those remaining portions of the statute that do not violate the United States or Minnesota Constitutions. *See State v. Barker*, 705 N.W.2d 768, 773 (Minn. 2005); *State v. Shattuck*, 704 N.W.2d 131, 143 (Minn. 2005); *see also State v. Melchert-Dinkel*, 844 N.W.2d 13, 24 (Minn. 2014) (setting forth guidelines for determining when it is permissible to sever the unconstitutional portions of a statute).

---

(Footnote continued from previous page.)

the imposition of a sentence of LWOR on Ali. *See Sawh v. City of Lino Lakes*, 823 N.W.2d 627, 637-38 (Minn. 2012) (stating that the use of the word "shall" in a statute "indicates a duty that is mandatory, not one that is optional or discretionary"). Instead, we have to be dealing with a hypothetical statute of the court's own making, and, as Justice Page points out in his dissent, it is impossible to know whether the court's hypothetical statute creates a constitutional problem under *Blakely v. Washington*, 542 U.S. 296 (2004). If the statutory maximum of the court's hypothetical statute is life with the possibility of release after 30 years, and additional facts must be found to impose a sentence of LWOR, then the Sixth Amendment to the United States Constitution requires those facts to be found by a jury, not by the judge. *Id.* at 301-04. Of course, the applicability of *Blakely* depends on the specific wording of the statute, which is another reason why the Legislature, and not this court, must amend the statute.

That is what the Minnesota Constitution requires us to do here. Whether phrased in terms of statutory revival or severance of the unconstitutional provisions, the remedy is the same: we must declare the heinous-crimes statute unconstitutional as applied to Ali and remand the case to the district court with instructions to impose a sentence of life with the possibility of release.